Joe **CASTANEDA** a/k/a Pepe
**Castaneda, Appellant,**

v.

**STATE of Texas, Appellee.**

No. 04–92–00275–CR.

Court of Appeals of Texas,
San Antonio.

April 14, 1993.

Reynaldo Ramirez, Public Defender, Laredo, for appellant.

Fausto Sosa, Asst. Dist. Atty., Appellate Section, Laredo, for appellee.

Before REEVES, C.J., and CHAPA and RICKHOFF, JJ.

## OPINION

RICKHOFF, Justice.

Appellant, Jose "Pepe" Castaneda, was convicted by a jury of murder.[1] Punishment, enhanced by previous convictions for attempted murder and burglary, was assessed by the court at life imprisonment. Appellant now appeals alleging two points of error.

*We affirm.*

The first point of error challenges the admission of appellant's tape-recorded statement of the events leading to the death of Prisco Ramirez. Appellant argues that the State did not provide his counsel with a "true, complete, and accurate copy" of the recording no later than 20 days before trial in conformity with the Texas Code of criminal procedure. *See* TEX.CODE CRIM.PROC.ANN. art. 38.22 § 3(a)(5) (Vernon Supp.1993).

Prior to trial, appellant filed a discovery motion requesting "any and all recordings in the possession of the State." The State opened its files to appellant for inspection on November 7, 1991, more than two months before trial. No recording or copy of appellant's statement was in the file on that date; it did, however, contain a police report with a transcription of the recording.

At trial, a police officer testified that he obtained a tape-recorded statement concerning Ramirez's death from appellant. When the State moved to admit the tape, the following ensued:

Mr. Sosa: (prosecutor) At this time, your Honor, I would move for for State's Exhibit 16 to be admitted.

Mr. Montemayor: (appellant's counsel) Your Honor, we're going to object. The proper predicate has not been laid.

---

1. The record shows that appellant was indicted along with his brother, Raul, for attempted murder and murder. The brothers were then tried together for the offenses before a jury. Raul Castaneda was also found guilty by a jury of murder.

The Court: Be more specific counsel.

Mr. Montemayor: The elements that must be met is, number one, recording is relevant. Number two, recording machine was testified before being used; it was in normal operating condition, recording machine was used and accurately recorded—what we're going on is after the recording was made, the operator replayed the tape and the tape had accurately recorded the sounds and images. The tape was then labeled, sealed and placed in a secure storage vault to guard against tampering and later removed for trial still in the seal condition.

Thereafter, in a dialogue between the judge, the prosecutor and co-defendants' counsel, the judge directs counsel to the notice provision of article 38.22 § 3(a)(5), which provides:

No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless ... not later than the 20th day before the date of the proceeding the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

TEX.CODE CRIM.PROC.ANN. art. 38.22 § 3(a)(5) (Vernon Supp.1993).

The prosecutor again sought to admit the tape. This followed:

The Court: You have no other objections?

Mr. Montemayor: No, sir.

The Court: Then what's the exhibit number?

Mr. Sosa: Exhibit 16.

The Court: State's Exhibit 16 is admitted. The objections are overruled. Before you do that let me just inquire; counsel you have had (sic) received the contents of this recording?

Subsequently, a hearing was held outside the presence of the jury to determine whether there had been compliance with article 38.22 § 3(a)(5). The court was ad-

vised that two months prior to trial, appellant's counsel was shown the State's entire file, including the transcription. Appellant did not claim that he had not seen the transcription; rather, he claimed not to have heard the recording. The court then called a recess and instructed counsel to compare the transcription with the recording before the jury returned.[2] After recess, the following ensued:

The Court: Is there anything you need to take up outside the hearing of the jury before we bring the jury back?

Mr. Montemayor: No, Judge, just the objection as to the introduction of the tape.

The Court: What's the objection?

Mr. Montemayor: According to 38.21—

The Court: 38.21?

Mr. Montemayor: 38.22. The State is supposed to provide us with a true, complete copy of all the recordings.

The court then overruled appellant's objection and allowed the jury to hear the recording.

■■■ In order for an issue to be properly preserved for appellate review, there must be a timely objection specifically stating the legal basis for the objection. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim. App.1990); *Miranda v. State*, 813 S.W.2d 724, 737 (Tex.App.—San Antonio 1991, writ ref'd). Furthermore, in order to preserve error on appeal by way of objection alone, the objection must come before the tangible evidence which is clearly objectionable is admitted. *Sierra v. State*, 482 S.W.2d 259, 262 (Tex.Crim.App.1972).

■■■ In the present case, appellant's restated and correct objection to the admission of the recording on grounds the State did not comply with article 38.22 § 3(a)(5) did not come until after the exhibit was admitted. However, we conclude that the court's reconsideration of the recording's admissibility subsequent to admitting the tape allows us to consider whether the

---

**2.** The record reveals that the audiotape and the transcription contained in the police files are similar except for the exclusion of two "okays" in the transcription and the omission of a sentence in the transcription that was spoken twice on the audiotape.

court improperly overruled appellant's restated objection.

■ Under article 38.22 § 3(a)(5), the State was required to provide a "true, complete, and accurate copy" of the oral statement to appellant no later than 20 days before trial. This requirement is to be strictly construed. TEX.CODE CRIM.P. ANN. art. 38.22 § 3(e). Thus, we cannot say that the State complied with article 38.22 § 3(a)(5) by making a *transcription* of the recording available to appellant. Under these circumstances, we find the trial court erred by overruling appellant's objection and admitting his tape-recorded statement.

■ We must next determine whether appellant was harmed by the error. If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or punishment. TEX.R.APP.P. 81(b)(2).

In making our determination, we note that appellant's defense at trial relied upon the theories of self-defense and defense of third parties; in fact, appellant requested, and the court submitted, these two defensive issues in the charge. Moreover, appellant's counsel argued in his closing, "... Pepe Castaneda has never denied firing the weapon ... He's never denied it. But he is saying yes, I fired. That guy was hitting my brother. He started coming at me and my mother. What was I to do?"

At trial, appellant's statement was the only direct evidence substantiating appellant's theories of self-defense and defense-of-a-third-party. What follows are pertinent excerpts:

I was inside my home sleeping when my mother told me that what is happening outside the house. I got up and I went out to see what was happening. I saw the man with the Machete. My brother was fighting with Alex. Then when I saw the man who had the machete he was going to hit, he hit him once, my brother, in the back. I ran inside, I got the pistol and I went outside and I fired

at him when he hit my brother in the back with the machete. Then I fired several other times. After that, I ran inside, I went out the back door and I made a hole and I buried the gun.

. . . .

What I was going to say also is that I was in self-defense. (sic) I was defending my house and brother that they would not kill him with the stick.

. . . .

He hit him. He hit him on the back with the machete and when I came out I told him, hey, leave him alone, and then he came against me with the machete and I fired. He ran again towards where my brother was and he was going to hit him with the machete in the head and that's when I fired the rest of the shots.

After reviewing the entire recording, including the excerpts above, we conclude appellant's statement did not contribute to the conviction; rather, if believed, the statement would have bolstered his defensive theories and contributed to his acquittal. Considering the nature of the statement, we hold that the error in admitting the audiotape was harmless beyond a reasonable doubt. Point of error one is overruled.

■ In his second point of error, appellant argues that the trial court erred by failing to instruct the jury of appellant's right not to testify at the punishment stage of the trial. The right not to testify continues beyond conviction until after a defendant has been sentenced. *Beathard v. State*, 767 S.W.2d 423, 432 (Tex.Crim.App. 1989); *citing Brumfield v. State* 445 S.W.2d 732, 735 (Tex.Crim.App.1969). Moreover, a defendant has a right to a "no-adverse-inference" instruction—concerning the fact a defendant elects not to testify—at the punishment stage of a trial. *Beathard v. State*, 767 S.W.2d at 432.

■ We must initially determine whether appellant either objected to the failure to include a "no-adverse-influence" instruction or made a proper request to add such instruction. A defendant may waive the right to a "no-adverse-influence" instruc-

tion unless either a request is made to the trial court to add the instruction to its charge at the punishment stage or an objection is made to the omission of such instruction. *See Brown v. State*, 617 S.W.2d 234, 238 (Tex.Crim.App.1981).

Prior to the submission of the charge to the jury, counsel for Raul made the following objection to the proposed charge on punishment:

> ... First of all, I'm going to object to the Court's Charge ... I also requested an instruction as to defendants' failure to testify and not to be used against him. It was requested by counsel based on the fact that they did not testify at the punishment stage and it was requested and the Court denied it.

Immediately thereafter, Javier Montemayor, counsel for appellant, stated to the court:

> Judge for the record, Javier Montemayor representing Jose Castaneda. We'd also like to object to the Court's Charge on Punishment in that we're also asking the Court to include that the jury may consider all the circumstances that was presented in the guilt and innocent stage. We're also asking the Court to consider including in the charge the fact that—the instructions on the right to testify of the Defendant, Jose "Pepe" Castaneda, based on the fact that he didn't testify during the evidentiary stage.

Considering the above-mentioned dialogue, we conclude it should have been sufficiently clear that appellant's counsel, like Raul's counsel, was objecting to the failure of the charge to instruct the jury on appellant's right not to testify at the punishment stage. After this objection, no other exception or objection to the court's charge was necessary to preserve error. *See* TEX.CODE CRIM.PROC. art. 36.15 (Vernon Supp.1993).

■ Finding error, we must now determine whether such error is reversible. *See White v. State*, 779 S.W.2d 809, 828 (Tex. Crim.App.1989), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *Jannise v. State*, 789 S.W.2d 623, 628 (Tex.

App.—Beaumont 1990, pet. ref'd). Since this is a case of charging error with timely objection, we will reverse only if the error was calculated to injure the rights of the defendant, which means there must be some harm to the accused from the error. *See id.; citing Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1984); *cf. Rose v. State*, 752 S.W.2d 529 (Tex.Crim.App. 1988). We find that no harm occurred to appellant from the trial court's failure to give the "no-adverse-influence" instruction.

In making this determination, we find the case of *White v. State*, 779 S.W.2d at 809, controlling. In *White*, the Appellant was convicted of capital murder in connection with the suffocation and strangulation of an eighty-year-old woman. His punishment was assessed at death. At the punishment stage, the State introduced evidence that the Appellant had committed a previous murder; that he was in the process of committing a burglary when he was arrested; and that he had a reputation for violence. The Appellant did not testify at the punishment stage. Affirming the Appellant's conviction, the Court of Criminal Appeals held that the trial court's failure to give the "no-adverse-influence" instruction was not calculated to injure the rights of the Appellant.

In the present case, similar evidence was introduced at the punishment phase of trial. First, the State introduced appellant's two previous felony convictions that served to enhance his present conviction. And, as in the *White* case, the State introduced reputation for violence evidence. Appellant also called Graciela Castaneda, the mother of Raul and appellant. She testified her sons "were very innocent."

Besides the similar testimony adduced at the punishment phases of both *White* and our case, we are influenced in our determination that no harm occurred to appellant by the fact that the jury was able to hear testimony bolstering his theories of self-defense and defense-of-a-third-party through his statement as well as the testimony of other witnesses; and that, during voir dire, each venireperson who was ultimately selected to sit as a juror was in-

structed on appellant's right not to testify. We also note that appellant received the maximum sentence available, life imprisonment. It does not necessarily follow, however, that there occurred some harm to appellant because he received the maximum sentence. *See id.* at 828 (no harm from omission of "no-adverse-influence" in death penalty case). Finding no harm occurred to appellant, we overrule appellant's second point of error.

The judgment of conviction is affirmed.

CHAPA, Justice, concurring & dissenting.

I respectfully concur and dissent.

This case involves the commission of two errors which the majority concludes are both harmless under Texas Rule of Appellate Procedure 81(b)(2).[1] The first error involves the denial of appellant's request under section 3(a)(5) of article 38.22 of the Texas Code of Criminal Procedure. After an appropriate analysis, the majority correctly concludes that the error was harmless under Texas Rule of Appellate Procedure 81(b)(2). I concur.

The second error, however, involves a denial of a much more fundamental right of the appellant. The trial court refused appellant's timely requested instruction to the jury regarding his right to remain silent during the punishment stage to which he was clearly entitled. *Brown v. State,* 617 S.W.2d 234, 238 (Tex.Crim.App.1981). The accused received the maximum sentence. Unlike the first error, the majority erroneously concludes that this error was also harmless under Rule 81(b)(2). I disagree and respectfully dissent.

In considering the application of Rule 81(b)(2), certain factors must be considered

by the appellate court before even reaching the analytical evaluation of the circumstances of the case.

Initially, there can be no disagreement that Rule 81(b)(2) was never meant to whitewash every error committed against every appellant. If that had been the purpose, the rule would not have placed the extremely heavy burden upon the appellate court to avoid reversal only when "the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment."

Implicit in the rule is the requirement that the appellate court conduct a meaningful and complete analysis of the totality of the circumstances before justifying the conclusion that the error was harmless. In *Almanza v. State,* 686 S.W.2d 157 (Tex. Crim.App.1984), the court emphasized this requirement, stating:

> In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.

*Id.* at 171.

Logic dictates that the repeated invocation of the rule for repeated errors in a single trial significantly weakens the justification for favorably applying the rule with every subsequent error. Certainly, if errors are repeatedly made during a single trial, eventually there has to be some harm. I cannot perceive that our rule of law would condone and encourage repeated alleged harmless errors, when the ultimate result sought is a fair trial.[2]

---

1. Tex.R.App.P. 81(b)(2) provides:
   Criminal Cases. If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

2. In *Harris v. State,* the Texas Court of Criminal Appeals made the following statement when addressing the harmless error issue:

> Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a magnitude that it disrupted the juror's orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted.

*Harris,* 790 S.W.2d 568, 587 (Tex.Crim.App. 1989).

Another factor to be considered by the appellate courts is the applicable standard of review on appeal established by *Almanza,* which distinguishes significantly between the degree of harm necessary to reverse when the error is properly preserved by objection and when it is not. In *Almanza,* the court stated:

If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is "calculated to injure the rights of defendant," which means no more than that there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.

On the other hand, if no proper objection as made at trial and the accused must claim that the error was "fundamental," he will obtain a reversal only if the error is so egregious and created such harm that he "has not had a fair and impartial trial"—in short, "egregious harm."

*Id.*

Since this appellant made a timely objection to the charge, this court is bound to follow the more lenient "some harm" standard set out in *Almanza* in the process of conducting the complete analyses required under Rule 81(b)(2). *Beathard v. State,* 767 S.W.2d 423, 432 (Tex.Crim.App.1989).

This court must also remain cognizant of who has the burden under the rule of establishing that the error is harmless beyond a reasonable doubt. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court stated:

Certainly error, constitutional error, ... casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put *the burden on the beneficiary of the error* either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. [Footnote omitted.] There is little, if any, difference between our statement in

*Fahy v. State of Connecticut* [375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171] about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and *requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained. [Emphasis added.]

386 U.S. at 24, 87 S.Ct. at 828. The State clearly is the "beneficiary of the error" here and has the burden of establishing that the error complained of was harmless beyond a reasonable doubt.

In this respect, we note that in its brief, the State initially attempts to improperly place its own burden on the appellant, stating, "In his brief, Appellant did not consider or otherwise address this matter or even claim that he was harmed in any way by the trial court's action." Perhaps unaware of its burden, the State then presented the following weak argument:

The facts in the present case are almost identical to those in *White [v. State,* 779 S.W.2d 809 (Tex.Crim.App.1989), *cert. denied,* 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990)]. In the punishment phase of Appellant's trial, the State introduced evidence of Appellant's prior convictions as well as his reputation for being a peaceable and law abiding citizen. Appellant offered no evidence at the punishment phase of the trial. In his brief, Appellant did not consider or otherwise address this matter or even claim that he was harmed in any way by the trial court's action.

The State would submit that this alleged error was harmless especially in light of the fact that during voir dire, each venireperson who was ultimately selected to sit as a juror was instructed on defendant's personal right not to testify. Each venireperson answered that he or she understood this right and would not hold it against the defendants if they did not testify. See (S.F. Vol. II pages 18, 56, 63).

Contrary to the State's contention, the record here reflects that the facts sur-

rounding the trial as well as the facts surrounding the offense itself are indeed completely unlike *White*, upon which the State relies. *White* involved the intentional and inexcusable heinous rape and murder of two very old, helpless ladies and the theft of their cars. The case before us involves the killing of the complainant while he was allegedly assaulting the brother of the appellant with a machete and approaching the appellant and his mother. In *White*, while it is unclear whether the appellant testified during the guilt/innocence phase of the trial, it is clear that he confessed to the two murders, offering no justification for his actions and showing no remorse. The appellant here did not testify at all, but consistently contended in his statement and evidence that he was acting in self-defense and the defense of another. Also contrary to the State's contentions, this record further reflects that the appellant did in fact present two witnesses in the punishment phase of the trial, and although the jurors were generally admonished during voir dire of the defendant's right to remain silent, the part of the record to which appellant refers us fails to reflect that the jurors were questioned individually on the subject as suggested by the State.

Consequently, considering the heavy burden upon the State, I fail to see how the State has carried its burden of establishing beyond a reasonable doubt that the error was harmless.

Nevertheless, even if we ignore the foregoing, there is no justification to conclude that the error was harmless beyond a reasonable doubt. Considering that the applicable "some harm" standard of review before us requires reversal if the error is "calculated to injure the rights of the defendant," this court should pay particular heed to how significant the Supreme Court of the United States considers the defendant's right to a no inference instruction regarding his remaining silent throughout the trial.

In *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), the court vehemently set out the significance of an accused's fundamental right to remain silent:

> We have repeatedly recognized that "instructing a jury in the basic constitutional principles that govern the administration of criminal justice," [cite omitted] is often necessary.[19] Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law. *Such instructions are perhaps nowhere more important than in the context of the Fifth Amendment privilege against compulsory self-incrimination,* since "[t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are ... guilty of crime...." [Cite omitted.] And, as the Court has stated, "we have not yet attained that certitude about the human mind which would justify us in ... a dogmatic assumption that jurors, if properly admonished, neither could nor would heed the instructions of the trial court...." [Cite and footnote omitted.]
>
> A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and *he has an affirmative constitutional obligation to use that tool when a defendant seeks its employment.* No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instructions to reduce that speculation to a minimum.[21]
>
> ....
>
> The freedom of a defendant in a criminal trial to remain silent "unless he chooses to speak in the unfettered exercise of his own will" is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth. [Cite omitted.] And the Constitution further guarantees that no adverse inferences are to be drawn from the exercise of that privilege. [Cite omitted.] Just as adverse comment on a defendant's silence "cuts down on the privilege by making its assertion costly," [cite

omitted] the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. Accordingly, *we hold that a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify.* [Emphasis added.]

[19] In *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 [ (1978) ], the Court held that the Due Process Clause requires that instructions be given on the presumption of innocence and the lack of evidentiary significance of an indictment. The Court recognized that an instruction on the presumption of innocence has a "salutary effect upon lay jurors," and that "the ordinary citizen well may draw significant additional guidance from such an instruction." [Cite omitted.] The Court stressed the "purging" effect of the instruction and the need to protect "the accused's constitutional right to be judged solely on the basis of proof adduced at trial." [Cite omitted.] *The same can be said, of course, with respect to the privilege of remaining silent.* Indeed, the claim is even more compelling here than in *Taylor,* where the dissenting opinion noted that "the omission [in Taylor's trial] did not violate a *specific constitutional guarantee, such as the privilege against compulsory self-incrimination.*" [Cite and footnote omitted.] [Emphasis added.]

[21] The importance of a no-inference instruction is underscored by a recent national public opinion survey conducted for the National Center for State Courts, revealing that 37% of those interviewed believe that it is the responsibility of the accused to prove his innocence. 64 A.B.A.J. 653 (1978).

450 U.S. at 302–05, 101 S.Ct. at 1120–21.

Recognizing this powerful message of the United States Supreme Court in *Carter,* the Texas Court of Criminal Appeals in *Brown v. State,* 617 S.W.2d 234 (Tex.Crim.

**3.** In *Carter v. Kentucky,* 450 U.S. at 304, 101 S.Ct. at 1121, the United States Supreme Court stated:
 While it is arguable that a refusal to give an instruction similar to the one that was requested here can never be harmless, cf. *Bruno [v. United States,* 308 U.S. 287, 293, 60 S.Ct. 198, 200, 84 L.Ed. 257 (1939) ], we decline to reach the issue, because it was not presented to or considered by the Supreme Court of Kentucky. [Cite omitted.]

App.1981), announced a clear and unequivocal rule regarding the issue before us:
 We hold that where a request is made to the trial court to add to its charge at the punishment stage of the trial an instruction on the failure of the defendant to testify, or an objection is made to the omission of such charge, *it is reversible error* if the trial court fails to honor that request or objection because we find that "members of the jury, unless instructed otherwise, may well draw adverse inferences from a defendant's silence," at the punishment phase of the trial, just as they could from the defendant's silence at the guilt-innocence stage of the trial. "No judge can prevent jurors from speculating about why a defendant stands mute ..., but a judge can, and must, *if requested to do so,* use the unique jury instruction to reduce that speculation to a minimum." See *Carter,* supra, ... 101 S.Ct. at 1113. [Emphasis added.]

*Id.* at 238.

Thus, according to this holding, this court would be required to reverse the case before us as to punishment, without any further consideration.

Nevertheless, finding justification in the United States Supreme Court's refusal to directly address the issue of whether this error could ever be considered harmless,[3] and declaring that their holding was "[l]imited to the unusual factual setting of this case," the Texas Court of Criminal Appeals in *Beathard v. State,* 767 S.W.2d 423, 433 (Tex.Crim.App.1989), appears to have reversed its clear and unequivocal pronouncement in *Brown* and applied the harmless error analysis for the first time to what had been considered automatic reversible error.[4] The court stated:

**4.** It is interesting to note that in *Brown,* the Texas Court of Criminal Appeals clearly based its en banc opinion on what the United States Supreme Court *said* in *Carter,* holding that "where a request is made to the trial court to add to its charge at the punishment stage of the trial an instruction on the failure of the defendant to testify, or an objection is made to the omission of such charge, *it is reversible error* if the trial court fails to honor that request or objection" without any mention whatsoever

In *Carter v. Kentucky,* supra, the Supreme Court expressly reserved the question of whether this type of error can be harmless. *Carter,* supra [450 U.S.] at 304, 101 S.Ct. at 1121. To the extent that we believe that the error in this case could not have contributed to the jury's answer to the special issues, we must necessarily find that this is not a right which is "so basic to a fair trial that [its] infraction can never be treated as harmless...." *Chapman [v. California]* 386 U.S. at 23, 87 S.Ct. at 827–28. *Id.* at 432, n. 16. Considering the particular jealousy with which the Texas Constitution guards the individual due process rights of its citizens,[5] the majority opinion drew a well-reasoned predictable dissent.

Following suit, the Texas Court of Criminal Appeals again applied the harmless analysis to an identical error in *White v. State,* 779 S.W.2d 809, 828 (Tex.Crim.App. 1989), *cert. denied,* 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990).

It is upon *Beathard* and *White* that the majority erroneously misplaces its reliance without considering how very distinguishable both cases are from the case before us.

*Beathard* involved an intentionally planned murder of three relatives of one of the perpetrators, which was carried out by the appellant and an accomplice in a cold, calculating fashion. After conducting an extensive analysis, the court concluded that "[l]imited to the unusual factual setting of this case, ... the trial judge's error in

failing to give a 'no-adverse-inference' instruction was, beyond a reasonable doubt, harmless." 767 S.W.2d at 433. The court set out its basis, stating:

The right to a "no-adverse-inference" instruction is rooted in a jury's natural tendency to assume that the decision not to testify stems from a defendant having something to hide. See generally *Carter v. Kentucky,* supra. In the instant case, this was not a concern. By testifying during guilt/innocence, the jury heard numerous things from the appellant.[17] In addition, the State presented no evidence at the punishment phase. Thus, appellant was not placed in a position where the jury would expect him to counter factual assertions made by the State. In fact, if the jury was to draw any improper inferences from a failure to present a case, it would have been made against the State.[18] Appellant did, however, call six witnesses.[19] Limited to the unusual factual setting of this case, we find that the trial judge's error in failing to give a "no-adverse-inference" instruction was, beyond a reasonable doubt, harmless.

---

[17] During guilt/innocence, appellant related his version of the facts, his current and past employment, his educational attainments, his family background, and his lack of any criminal record. Aside from a plea for mercy, which was made by appellant's motion, we can think of nothing else that appellant could have said during the punishment phase that he had not already said.

[18] During voir dire, each venireman who was ultimately selected to sit as a juror was

---

about the harmless error rule. [Emphasis added.] *Brown,* 617 S.W.2d at 238.

However, without actually overruling *Brown,* the Texas Court of Criminal Appeals, in what appears to be an afterthought, applied the harmless error rule for the first time in *Beathard,* ironically basing this action on what the United States Supreme Court *refused to say* in the same *Carter* opinion.

5. The Texas Constitution goes further than the Fifth and Fourteenth Amendments of the United States Constitution and contains two separate, noncoterminous, due process provisions—section 13 and section 19 of Article I. *Nelson v. Krusen,* 678 S.W.2d 918, 921 (Tex.1984); *see also Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983).

Article I, § 13, provides in part: "All courts shall be open, and every person for an injury

done him, in his lands, goods, person or reputation, shall have remedy by due course of law."

Article I, § 19, states: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

The admonishment in the final section of the Texas Bill of Rights is also of particular significance in this respect:

To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

Tex. Const. art I, § 29.

instructed both on appellant's right not to testify and his general right not to put on a defense. Each venireman/juror stated that he or she understood these rights and would not hold it against the defendant if he did not testify or call witnesses.

These instructions are of particular importance because, at punishment, appellant went beyond what was required of him by calling witnesses. The jury knew he was not obligated to do so.

> [19] During the punishment phase appellant called six character witnesses. These included his mother and Cathy Ross, the woman with whom appellant was living. These witnesses testified to appellant's good and nonviolent character. Appellant's mother also testified about appellant's childhood. In addition to these six witnesses, appellant called twenty different character witnesses during the guilt/innocence phase. A number of these witnesses were psychologists or psychiatrists with whom appellant had worked at the Rusk State Hospital. The witnesses with psychological training generally testified concerning appellant's nonviolent tendencies. This testimony was similar to that which is often used to rebut psychological evidence of future dangerousness.

*Id.* at 432–33.

Unlike *Beathard,* this case involves a death which appellant contended occurred as a result of self-defense and the defense of another when the complainant was assaulting the accused's brother with a machete and when the complainant was approaching appellant and his mother. Also unlike *Beathard,* the record reflects that the veniremen were not questioned individually regarding the appellant's right to remain silent; the appellant did not take the stand at any time during the trial; the appellant did not present any psychological witnesses at all; the state did in fact present testimony of six damaging witnesses during the punishment phase of the trial regarding appellant's prior convictions and bad reputation; and, the appellant only presented his sister-in-law to establish appellant as the only support of his wife and

family and a plea from his mother for leniency during the punishment phase. Moreover, also unlike *Beathard,* the State made comments in closing arguments during the punishment stage that, intentional or otherwise, had the potential of delivering a prejudicial message to the jury regarding appellant's failure to testify.[6] Thus, this case is clearly distinguishable from *Beathard,* and does not fall within the "limited ... unusual setting of" *Beathard* to "justify holding that the failure to give a 'no-adverse-inference' instruction was, beyond a reasonable doubt, harmless." *Id.* at 433.

*White* involved an appellant who intentionally and heinously raped a seventy-two-year-old, ninety-two pound woman and murdered her by strangling and stabbing her with a screwdriver. The accused also stole her car and other items. After conducting an extensive analysis, the Texas Court of Criminal Appeals again held that under the unusual circumstances of that case, the failure of the trial judge to give a "no-adverse-inference" instruction during the punishment phase of the trial was, beyond a reasonable doubt, harmless. The court set out its basis as follows:

> At the punishment phase, the State introduced evidence that appellant had strangled and suffocated to death an 80 year old woman in Orlando, Florida, a matter of days before he murdered Elizabeth St. John in Houston. According to a confession introduced at punishment, appellant was hired to do some yard work for the elderly Mae Bailey, who he subsequently choked with his hands and suffocated with a pillow. He then took an antique clock from her house, as well as $25.00, a suitcase full of papers and the victim's 1965 Plymouth Valiant,

---

**6.** The record reflects the following remarks of the prosecutor in closing arguments during the punishment stage:

> Now, the Judge has basically given you several verdict forms with respect to Jose. There are four verdict forms. The first one—if you find that these two are correct and that he is the Jose "Pepe" Castaneda—*once again I need to stress*—there is no evidence to the contrary—then you have a choice of finding the enhancement provisions. [Emphasis added.]

> ....
>
> Give them the minimum, give them five. For what? So they can get out. What are they offering to you? *Nothing.* It's a smoke screen for you. *They're not offering you one iota, nothing.* They want you to be lenient with them. For what? So that they can be out on the streets again. There's no testimony from the mother and there's no testimony from the wife that they were working or not. *No testimony whatsoever.* [Emphasis added.]

which he ultimately drove to Houston. Appellant sold the clock to an antique shop. He retained the papers, which included the registration to the Valiant.

Appellant confessed to the murder of Mae Bailey at the same time he confessed to the remarkable similar murder of Elizabeth St. John to law enforcement officials in Myrtle Beach, South Carolina. According to Mitchell Kemp, appellant at that time made no expression of regret for his deeds or remorse for his victims.

The State also introduced reputation for violence evidence from Ron Blazer, the former Chief of Detectives for the City of Lancaster, Ohio, Police Department. Also, detailed evidence that appellant was in the process of committing a burglary of Romondo's restaurant when he was arrested in Myrtle Beach was elicited. This evidence had been excluded by the trial judge at the guilt phase.

Appellant offered no evidence at the punishment phase.

In view of the evidence offered at punishment, coupled with the evidence adduced in the guilt/innocence stage, we cannot say the trial court's failure give the requested charge was calculated to injure the rights of the defendant in this case. Finding that this could not have contributed to the jury's answers to the special issues under the record before us, we conclude he suffered no harm from the omission of the requested charge. 779 S.W.2d at 828.

But unlike *White*, this case involves a death which appellant contended occurred as a result of self-defense and the defense of another when the complainant was assaulting the appellant's brother with a machete and advancing towards appellant and his mother. There was no evidence that appellant intentionally raped and murdered any defenseless individual. The appellant never testified during this trial. Appellant never confessed without expressing remorse of an intentional murder without any justification. Appellant contended instead that he was acting in self-defense and in the defense of another. And there was no evidence appellant was in the act of com-

mitting a burglary when he was arrested. Moreover, also unlike *White*, the State made comments in closing arguments during the punishment stage that, intentional or otherwise, had the potential of delivering a prejudicial message to the jury regarding appellant's failure to testify. Thus, this case is likewise distinguishable from *White* and does not fall within the limited unusual setting of *White* to justify holding that the failure to give a "no-adverse-inference" instruction in the punishment phase was harmless beyond a reasonable doubt.

In summary, because this appeal involves the invocation of the harmless error rule in two distinct errors, the applicable standard of review is the lenient "some harm" standard under *Almanza*, the totality of the circumstances surrounding this case is completely distinguishable from *Beathard* and *White*, the United States Supreme Court has placed great significance on the right of an accused to remain silent, the State made prejudicial comments during arguments in the punishment stage, and, the State has failed to establish beyond a reasonable doubt that the error was harmless, there is no basis for the majority to hold that this error was not "calculated to injure the rights of the defendant."

Although as an intermediate court we are bound to follow the law as outlined by our superior courts, we should remain cognizant nevertheless that if the constitutional rights of an accused are not upheld today, there may be no constitutional rights to uphold tomorrow. I am therefore obliged to express my concern about the determination by the Texas Court of Criminal Appeals that an appellant's right to remain silent is "not a right which is 'so basic to a fair trial that [its] infraction can never be treated as harmless....' " *Beathard*, 767 S.W.2d at 432, n. 16. This broad pronouncement by the Texas Court of Criminal Appeals creates the probability that the harmless error rule could be applied as well when an accused has been denied a right to remain silent instruction in the guilt/innocence phase of the trial.

Because the right to remain silent has such a clear fundamental constitutional basis, I fear the specter of the harmless error concept creeping far enough to encompass a denial of an accused's requested instruction on his presumption of innocence.[7] This possibility would not only considerably diminish the benefits of all constitutional rights of those accused—innocent or otherwise—but it would have the potential of creating a license to deny accused their constitutional rights on the hopes that any error would nevertheless be declared harmless.[8] Thus, unfair trials could be the result, which would necessarily have a disastrous effect on our administration of justice system. In *Chew v. State*, 804 S.W.2d 633 (Tex.App.—San Antonio 1991, pet. ref'd.), this court stated:

> [I]n order to have a fair trial, the jury should have rendered its verdict based solely on the evidence properly admitted during trial, without considering other detrimental evidence [and aspects] which [were] not properly introduced. The Supreme Court of the United States addressed this issue more eloquently in *Brady*, stating that "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Id.* at 640.

I would reverse and remand for reconsideration of the punishment only.

---

**7.** The majority opinion is a perfect example of the potential for spreading the harmless error concept too far.

Although it is clear that the intent of the Texas Court of Criminal Appeals in *White* and *Beathard* was to confine the harmless error application to the unusual circumstances of the two cases when dealing with the right to remain silent, the majority here has taken the liberty of applying it to totally different circumstances.

Thus, unless stopped, the floodgates will open to a dangerous spread.

**8.** In *Harris v. State, supra,* the Texas Court of Criminal Appeals made the following statement when addressing the harmless error issue, "In addition, the Court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity...." 790 S.W.2d at 587.