NO. 07-07-0401-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

FEBRUARY 18, 2010
_____

RICKY MORRISON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-417,356; HONORABLE CECIL G. PURYEAR, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.


**MEMORANDUM OPINION**


Appellant Ricky Morrison appeals his conviction of the offense of aggravated sexual assault and the resulting sentence of fifty years confinement in the Institutional Division of the Texas Department of Criminal Justice. By two points of error, appellant contends the evidence presented was factually insufficient to support his conviction and the trial court erred by admitting his recorded statement to police into evidence. We affirm.

Background

Via an August 2007 indictment, appellant was charged with three counts of aggravated assault, including one count of aggravated sexual assault.[1] The State proceeded to trial on this count alone. The indictment also included an enhancement paragraph setting forth appellant's prior felony conviction for aggravated kidnapping.[2] Following appellant's plea of not guilty, the case was tried to a jury.

At trial, the State presented evidence to show that on March 29, 2007, Theresa Freda was violently and sexually assaulted by appellant after he offered her a ride home from a party. At the close of the evidence, the jury found appellant guilty of aggravated sexual assault as charged in the indictment and assessed punishment as noted. Appellant timely appealed his conviction and sentence.

Analysis

*Factual Sufficiency*

A factual sufficiency review of the evidence is "barely distinguishable" from the legal sufficiency review under *Jackson v. Virginia*.[3] *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). On direct appeal a court must begin its factual sufficiency review with the assumption that the evidence is legally sufficient. *Watson v. State*, 204 S.W.3d 404, 406 (Tex.Crim.App. 2006). A factual sufficiency review considers whether

---

[1] *See* Tex. Penal Code Ann. § 22.021 (Vernon 2007).

[2] Appellant's conviction was thus enhanceable pursuant to Penal Code § 12.42. *See* Tex. Penal Code Ann. § 12.42 (Vernon 2007). During the punishment phase of trial, appellant plead true to this enhancement.

[3] *Jackson v. Virginia*, 433 U.S. 307, 61 L.Ed.2d 560, 99 S.Ct. 2781 (1979).

the evidence supporting guilt, though legally sufficient, is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or evidence contrary to the verdict is such that the jury's verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). Performing such a review, we consider all the evidence, in a neutral light. *Marshall*, 210 S.W.3d at 625; *Watson*, 204 S.W.3d at 414.

As pertinent here, to secure a conviction for aggravated sexual assault, the State must prove beyond a reasonable doubt the defendant intentionally or knowingly caused penetration of the sexual organ of another by any means, without that person's consent; and by acts or words occurring in the presence of the victim threatened to cause or placed the victim in fear of death, serious bodily injury, or kidnapping. Tex. Penal Code Ann. § 22.021(a)(1)(A)(i), (a)(2)(A)(iii) (Vernon 2007).

The events leading to appellant's prosecution occurred in the early morning hours. Freda, a 40-year-old, testified she left a party where she had taken drugs and drunk beer. When she was unable to contact her husband, she decided to walk home. Appellant, whom she knew from "smoking crack," drove past in his white pickup. He offered Freda a ride home and she accepted.

Freda testified that on the way, appellant told her he needed to stop at his house. Freda went into appellant's house for a drink of water. While there, appellant pulled Freda into a "vice grip" and Freda told him to "quit it." When appellant disregarded her request that he release her and instead pulled her closer, Freda became scared and began struggling. As appellant attempted to drag Freda into the bedroom, she latched

3

onto the door frame but appellant managed to pull her into the bedroom and shut the door. He grabbed a knife and shoved it into the doorjamb. Appellant ordered Freda to take her clothes off and she complied because she was scared, in part because of appellant's access to the knife. Appellant started to take his own clothes off and ordered Freda onto the bed.

Appellant got on top of Freda, but she fought "vehemently" to keep him from raping her. She said that during their struggle appellant inserted his finger into her vagina. On re-direct, Freda testified that she told hospital personnel that appellant "shoved his finger inside of me." Freda testified that she "snapped" when this happened and became "like a wild animal," trying to get out of there and "grabbing wherever [she] could." Appellant finally stopped and told Freda to get dressed. While she was dressing, she heard appellant mumbling about not going back to prison and saying that he would "kill [Freda] first". Freda was terrified she would not survive the situation.

Despite appellant's warning not to run as they left the house, Freda took the opportunity to attempt escape as appellant got into his truck. She said she reached a neighbor's house but was able to knock only once on the door before appellant grabbed her wrist. Appellant told her she was going to die and he "was going to die right along with [her]." Freda ran to a car parked in front of the neighbor's house and held on while appellant continued to try to grab her and move her. Appellant pulled at her shirt, eventually pulling her shirt and bra off. When appellant hit Freda, causing bleeding, she screamed. Freda then heard appellant's knife "click" and she screamed three more times. She assumed a fetal position while appellant cut the left side of her face and eye. Two neighbors heard and saw the commotion and called police.

4

Officer Eric Sturgeon testified he answered the domestic disturbance call. When he arrived, he spoke with Pauline Escamilla, a neighbor of appellant. Sturgeon testified that Escamilla was upset and told him she woke up when she heard a scream. She went outside and down the street and saw a male kicking and hitting a female lying on the ground. Escamilla yelled at the male and he ran off. Freda told Escamilla that the person kicking and hitting her was appellant. Escamilla took Freda into her house, where Sturgeon saw Freda lying on the kitchen floor. She did not appear to have a shirt on, but was covered with a blanket on top and was wearing jeans. Freda had blood covering her face and hair and there was blood around her head and on the kitchen floor. Freda was crying and told the officer that appellant had attempted to sexually assault her but she fought him off.

As Sturgeon walked toward appellant's house, he saw pools of blood on the street. A second officer, Rosa Cox, testified to the pools of blood and opined that it appeared someone had been dragged. She noted blood in the mud as well. Photographs in evidence depict Officer Cox's descriptions and observations. She testified she did not find any clothing on the street.

Officer Matthew Martinez testified he spoke with Freda at the hospital. Her statement to the officer was generally consistent with her testimony at trial. Officer Martinez observed that Freda appeared to have been involved in a struggle and agreed that her statement was consistent with the injuries he observed. The jury saw photographs also depicting Martinez's descriptions and observations.

Appellant's two neighbors also testified to observations generally consistent with Freda's version of the events outside appellant's house. Joe Gutierrez testified he had known appellant for over twenty years. He further testified his mother-in-law woke him up at about 2:30 on that morning because she heard a woman screaming in the street. Gutierrez also heard a scream and stated it "just scared the hell out of [him]." He called 911, telling the operator there was a woman outside, screaming, and that he thought someone was getting hurt.[4] After he made his 911 call, Gutierrez went outside and saw two shadows in the street. He said he saw a female on the ground and a male figure standing over her, straddling her. Gutierrez shortly heard Pauline Escamilla call out to the people in the street. The male figure stood up and Gutierrez recognized him as appellant. A minute later, Gutierrez saw appellant's truck drive away. He was not sure if appellant was driving it.

Pauline Escamilla testified she and appellant had been neighbors since 1993. She said that at about 2:30 a.m., she heard "a horrible pain scream" coming from a woman. She heard voices and recognized appellant's voice. Escamilla saw a man she immediately recognized as appellant, hitting a woman.[5] She screamed at appellant, calling him a name and telling him to "leave that girl alone." Escamilla testified that

---

[4] A record of his 911 call was played for the jury.

[5] Officer Sturgeon's report said "P. Escamilla could not identify R. Morrison by sight due to the dark street." On cross-examination, Escamilla testified she did not tell the officer she could not identify appellant by sight that night because it was dark.

appellant immediately took off and got in his truck. She then clarified that she did not see appellant get in the truck but saw his truck driving away.[6]

Escamilla testified she took Freda into her house. She said Freda "was totally bleeding from the top of her head to her waist" and she was naked from the waist up. She said Freda was hysterical and appeared to be in a lot of pain. Escamilla also called 911. She testified that Freda told her that appellant was beating her up.

Detective Tracy Taylor testified he took Freda's written statement when she came to the police department the next day. The statement was largely consistent with the injuries the detective observed on Freda. Freda clearly identified appellant as her attacker.

Terry Curtis, a friend of appellant's, testified for appellant. He said he was at appellant's house with appellant and Freda. He testified that Freda was mad at appellant because he refused to take her where she wanted to go so she left the house with two men. Curtis testified that he was at appellant's house until 1:00 that morning and did not see appellant hit Freda.

Appellant gave police a recorded oral statement, which was played at trial over his objection. In the statement, appellant maintained that he did not assault Freda in any way. He said she left his home and just walked away. He did not see her again that night. If neighbors identified him as Freda's attacker, they were "lying."

---

[6] Appellant was later arrested in a white pickup truck matching the description given by Freda and appellant's neighbors.

In his argument on appeal, appellant acknowledges the probative value of the testimony of his neighbors who identified him as the person they saw assaulting Freda. Appellant further acknowledges a conviction for sexual assault may be affirmed solely on the testimony of the victim, despite the absence of any medical evidence. Appellant nonetheless argues the evidence that he penetrated Freda as the indictment alleged is so weak as to be factually insufficient. In support of his argument, appellant points to a complete absence of medical evidence of penetration, together with evidence Freda failed to make her outcry at the earliest opportunity, told officers and hospital personnel nothing about the digital penetration, and turned down a sexual assault exam.[7]

Although the officer's reports state Freda complained of an attempted sexual assault, the reports do not mention the digital penetration. In fact, Martinez testified Freda told him no penetration was made.[8] His report stated "No penetration occurred whatsoever."

As noted, a conviction for indecency or sexual assault may be affirmed absent any medical evidence and solely on the testimony of the victim. *Rodriguez v. State,* 819 S.W.2d 871, 873-74 (Tex.Crim.App. 1991); *Tinker v. State,* 148 S.W.3d 666, 669-70 (Tex.App.–Houston [14th Dist.] 2004, no pet.), *citing Garcia v. State,* 563 S.W.2d 925, 928 (Tex.Crim.App. 1978); *Bottenfield v. State,* 77 S.W.3d 349, 356 (Tex.App.–Fort Worth 2002, pet. ref'd). The jury had an ample opportunity to evaluate Freda's

---

[7] At trial, Freda acknowledged she refused a rape examination at the hospital, telling the jury she did not think it would help. However, as noted, she testified that she told both hospital personnel and police that appellant "shoved his finger inside of [her]."

[8] Some testimony suggests the officer was intending to refer to penile penetration when he talked to Freda.

credibility. Although our authority to review the factual sufficiency of the evidence permits us to disagree with the jury's determinations, even to a limited degree those concerning the weight and credibility of the evidence, we must accord them due deference. *Marshall*, 210 S.W.3d at 625; *Johnson*, 23 S.W.3d at 9. Despite Freda's somewhat inconsistent prior statements and her admittedly impeachable background, the jury did not act in an irrational manner by choosing to accept her testimony she was digitally penetrated. *See Grotti v. State,* 273 S.W.3d 273, 283 (Tex.Crim.App. 2008) (ultimate question in factual sufficiency review is whether jury was rationally justified in finding guilt beyond reasonable doubt); *Marc v. State,* 166 S.W.3d 767, 772 (Tex.App.– Fort Worth 2005, pet. ref'd) (finding jury could have chosen to believe victim despite her history as drug user, prostitute and felon). *See also Goodman v. State,* 66 S.W.3d 283, 286 (Tex.Crim.App. 2001) (explaining jury's entitlement to believe Cretan Liar with five prior perjury convictions).

Further, we note that the State presented a convincing case appellant was the man who assaulted Freda in the street outside his home. The jury heard no evidence from which it could discern a motive or reason for such an attack other than that presented by Freda's testimony. We do not see an objective basis on which to find that the great weight and preponderance of all the evidence contradicts the jury's verdict. We find the evidence factually sufficient to support appellant's conviction and overrule his first point of error.

*Appellant's Statement*

In appellant's second point of error, he argues the trial court erred under article 38.22, § 3(a)(5) of the Code of Criminal Procedure in overruling his objection to the

introduction of his recorded statement into evidence, thus affecting his substantial rights. Article 38.22 of the Code of Criminal Procedure governs the admissibility of statements of an accused made as a result of custodial interrogation. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2001). Section 3(a) provides, in relevant part, "No oral or sign language statement of an accused made as a result of a custodial interrogation shall be admissible against the accused in a criminal proceeding unless: (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement; . . . and (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article." Article 38.22, section 3(a) is to be strictly construed and courts may not interpret it as making a statement admissible unless all requirements have been satisfied by the State. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (Vernon 2001). Nonetheless, an error of admission of a statement in violation of § 3(a)(5) is subject to a harm analysis. *See Sells v. State*, 121 S.W.3d 748, 765 (Tex.Crim.App. 2003) (finding error harmless).

During trial, when the State offered appellant's recorded statement, appellant's counsel objected, informing the court he had not received the recording in the time period provided in § (3)(a)(5). He said the State did not turn over the recording until less than two weeks before trial. Without hearing a response from the State or further comment, the trial court overruled the objection. The State appears to concede on appeal that it failed to comply with § (3)(a)(5). On this state of the record, we will assume the trial court erred by admitting the recorded statement, and proceed to

evaluate the harmfulness of the error. The focus of our harm analysis will be on the harm flowing from the erroneous admission of appellant's statement. *Sells*, 121 S.W.3d at 765; *Tigner v. State,* 928 S.W.2d 540, 547-48 (Tex.Crim.App. 1996). Non-constitutional error that does not affect substantial rights must be disregarded. Tex. R. App. P. 44.2(b); *Sells,* 121 S.W.3d at 765, n.69. Thus, we will not reverse because of the erroneous admission of the statement if, after examining the record as a whole, we have a fair assurance that it did not influence the jury, or influenced them only slightly. *Gray v. State,* 233 S.W.3d 295, 299 (Tex.Crim.App. 2007), *citing Ford v. State,* 73 S.W.3d 923, 925 (Tex.Crim.App. 2002).

As noted, in his recorded statement, appellant denied he assaulted Freda. Instead, he said, they had an ongoing relationship and she would often call him to come get her. According to appellant, on the night in question, Freda called him and he went to get her. Later that night, she wanted to go to a "dope house" but appellant refused to take her so she walked away from his house. He asserted the neighbors were lying if they said they saw him in the street fighting with Freda. He also said Freda was lying if she said he assaulted her.

Appellant contends the statement was devastating to his case because the jury was likely to find incredible his recorded assertions that his neighbors were lying.[9] As between him and Freda, he argues, his recorded statement caused the jury to brand him as "the liar." He points to the harm analysis in *Tigner*, in which the court concluded that without the defendant's incriminating statement, the State's case was not

---

[9] Appellant also points out the jury asked to hear appellant's statement again during their deliberations.

"overwhelming." *Tigner,* 928 S.W.2d at 548. The same is true here, appellant contends, because Freda's testimony was subject to such heavy impeachment.

We disagree. In his advancement of his argument, appellant forgets his beginning point: the credible testimony of his neighbors. Granted, in his statement appellant did not merely say his neighbors were mistaken, he said they were lying, which may well have damaged his credibility with the jury. But his neighbors' testimony was always going to be damaging to the theory appellant set out in his opening statement and supported with Curtis's testimony, that is, that Freda was at his house but left and was attacked by someone else. If the jury believed the neighbors' identification of him as the attacker, it was always going to reject appellant's theory, regardless of who testified to it.

The State argues admission of appellant's statement was harmless because it supported his theory that Freda was attacked by someone else,[10] and because appellant was able to use it as a substitute for testifying at trial, avoiding cross-examination and impeachment.[11] The State's argument provides an additional reason supporting our conclusion the error does not require reversal. *See Castaneda v. State,* 852 S.W.2d 291, 294 (Tex.App.–San Antonio 1993, no pet.) (finding error in admitting

---

[10] Indeed, from the State's fulsome description of the benefits appellant derived from admission of his recorded statement, one might wonder why the State offered it.

[11] During voir dire, appellant's counsel told the jury appellant would testify, but appellant decided against taking the stand. During his closing, appellant's counsel referred to the recorded statement, stating "Now, I told you during voir dire that Ricky would come and testify. And then we decided, 'why waste your time?' But you actually did hear from Ricky. Detective Taylor took his statement. He didn't hide behind the 5[th] Amendment. He told you he didn't do it. He was surprised he got arrested." The State also made brief reference to the content of the recorded statement in closing argument.

defendant's tape-recorded statement harmless because, if believed, statement would have bolstered theories of self-defense and defense of third parties).

Having examined the record as a whole, we find fair assurance the erroneous admission of appellant's statement did not influence the jury's guilty verdict more than slightly. We overrule appellant's second point of error, and affirm the trial court's judgment.

James T. Campbell
Justice

Do not publish.