TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00019-CR






Stephen Michaelwicz, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT


NO. 002250, HONORABLE JON N. WISSER, JUDGE PRESIDING






O P I N I O N




 Appellant Stephen Michaelwicz appeals his conviction for murder. Tex. Pen. Code
Ann. § 19.03 (West 2005). (1) The jury found appellant guilty and assessed his punishment at ninety-nine years' imprisonment. Notice of appeal was given.


Points of Error

 Appellant advances seven points of error. First, appellant contends that the trial court
erred in denying appellant's amended motion to dismiss the indictment for pre-indictment delay. 
Second, appellant urges that the "State committed reversible error" in failing to furnish the trial court
with the offense report and "DNA lab reports from another murder case for an in camera 'hearing.'" 
Third and fourth, appellant complains that the trial court erred in prohibiting appellant from
presenting evidence that the perpetrator of the offense "might have been" Michael Smith or Gary
Gaston. Fifth and sixth, appellant asserts that the trial court erred in failing to grant mistrials at the
punishment phase of the trial (1) when the State elicited from David Presley that appellant used
drugs after the State had been explicity instructed not to do so, and (2) when the deceased's father
testified that he had placed the deceased's mother in a mental hospital during the trial when the
parties had agreed the State would not adduce such evidence before the jury. Seventh, appellant
claims that the trial court erred in failing to instruct the jury at the punishment phase of the trial that
no adverse inferences could be drawn from appellant's failure to testify at that stage of the trial. We
will affirm the conviction. 


Background


 Appellant does not challenge the legal or factual sufficiency of the evidence to sustain
the conviction. A discussion of the facts will place the points of error in proper perspective. 

 In 1988, Stephanie Walrath and the deceased, Debra Guess, lived at 8510 Riddington
Drive in Austin. On Saturday, February 20, 1988, Walrath drove Guess to New West, a country
western club. She described Guess as being in a good mood. Guess had a "new outfit" she wanted
to show off, and wanted to see if Gary Gaston was at the club. Walrath explained that Guess had
dated Gaston "off and on." Guess entered the club and returned to Walrath's vehicle. She told
Walrath that she did not find Gaston but she was going to stay at the club and have a good time. 
Walrath recalled that Guess had consumed two or three beers before entering the club. Walrath
related that she went to her boyfriend's apartment where she spent the night. 

 The next morning, Sunday, February 21, 1988, Walrath returned to her home about
10:30 a.m. She found Guess lying on the living room floor, dead. Guess, wearing a pink house
dress, had one of Walrath's scarfs around her neck and her throat had been cut. 

 Austin Police Officer Fermin Delatorre was on patrol that morning and was the first
officer on the scene. The EMS and the fire department were already at the address. Delatorre
observed Guess's body, the gash across the neck, the blood and the scarf. Officer Danny Campos
was dispatched to the scene. His investigation showed no forced entry of the house. Sergeant
Detective Bruce Boardman arrived on the scene about 11:15 a.m. He described the blood around
Guess's head as fresh. Boardman found a bone handled pocket knife under Guess's bed. From his
investigation, he concluded the violence began in the hallway and escalated to the living room. 

 Dr. Robert Bayardo, Travis County Medical Examiner, performed the autopsy on the
same day. He testified that the cause of death was asphyxia due to manual and ligature strangulation,
along with the wound to Guess's neck. The wound was one-fourth of an inch in width, and had
penetrated deeply on the right side down to the spine, severing the carotoid artery and partially
severing the jugular vein. Dr. Bayardo testified that Guess was still alive when her throat was cut
because her heart continued to pump blood. Based on the liver temperature of 96 degrees, the
absence of rigor mortis, and the degree of liver mortis, the medical examiner stated that Guess died
between 9 and 9:30 a.m. on February 21, 1988. The doctor explained that assailants often cut
themselves when cutting victims. 

 Eighteen-year-old Michael Smith was washing the exterior windows of the house
where he lived on February 21, 1988, between 9 and 10 a.m. He lived there with his father, Herman
Rosales and Rosales's wife, Ann Walrath, sister of Stephanie. The house was across the street from
the house where Guess lived and her body was found. 

 Smith testified that he observed a black Mercury Cougar in the driveway of Guess's
house--a car he had never seen before. A little later Smith saw a man, whom he identified as
appellant, exit Guess's house carrying two white trash bags with something red inside. Appellant
placed the bags in the Cougar and returned to the house. Smith described appellant as having long
curly hair and a mustache, and wearing jeans, a pink or red shirt, cowboy boots and a straw hat. 
About a minute later, appellant emerged again from the house, got into the Cougar and drove off at
about 10 a.m. Approximately thirty minutes later, Stephanie Walrath came to the Rosales home to
report that she had found Guess dead. 

 Herman Rosales also observed the black Cougar in the driveway at the Guess house
on the morning of February 21, 1988. Rosales was in his living room with a large window and a
good view of the driveway. He stated that there was no possibility that anyone could have driven
up between the time he saw the Cougar and the time Guess was found dead. Ann Walrath testified
that she first noticed the black Cougar in the driveway about 4:15 a.m. on February 21, 1988, when
she was nursing her baby, and then again about 9:30 a.m. 

 Police investigation led to the black Mercury Cougar and its owner, Chuck Northam. 
Northam testified that in 1988 he had been a close friend to appellant. On Saturday, February 20,
1988, he and appellant decided to drive from Temple to Austin to party, drink alcohol, dance, and
pick up girls. About 9:30 or 10 p.m., they arrived in Austin in Northam's 1987 black Mercury
Cougar and went to the New West Club. They were drinking beer at the time. Northam stated that
he met a girl, Phyliss Lewis, at the club and learned she worked for the same company that he did. 
He spent most of the evening dancing and talking with Lewis. The New West Club closed at 2 a.m. 
Sunday morning. Appellant suggested that they go to the Dallas Nightclub. Northam told appellant
to drive the Cougar and he would ride with Lewis in her car. At the Dallas Nightclub, Northam saw
appellant was with a girl. When the club closed at 4 a.m., appellant told Northam that he was going
to a motel with the girl. Northam, who planned to spend the night with Lewis, let appellant borrow
his car. Lewis gave her telephone number to appellant so he could contact Northam about their
return trip to Temple. Appellant agreed not to call Northam too early in the morning. 

 Northam testified that appellant called him at 12:30 p.m. on February 21, 1988, and
informed Northam that he (appellant) had already returned to Temple in Northam's car. Northam
thought this was strange. Lewis drove Northam to Temple. On Monday, February 22, 1988, Lewis
called Northam and informed him that there had been a murder in Austin and his car was involved. 
The police contacted Northam and interviewed him. Lewis generally corroborated Northam's
testimony. 

 Paul White's testimony placed Guess at the New West Club on February 20, 1988. 
He had seen her there on prior occasions. On the night in question, she was drinking and "seemed
out of it." White saw Guess flirting with a "cowboy" and they danced sexually. White tried to get
Guess to go home but she said that she was going to the Dallas Nightclub with the "cowboy." Keith
Couch, a security guard at the Dallas Nightclub, related that Guess was in the club between 2 and
4 a.m. on February 21, 1988, with a man with a cowboy hat and mustache. 

 Appellant's fingerprints were found in the Guess house on a bathroom door and a
knickknack. A mixture of DNA was found on the door post of the Guess house and on the driver's
door of the Mercury from which mixture appellant and Guess could not be excluded as contributors. 

 Appellant testified in his own behalf. Appellant acknowledged that he and Northam
drove to the New West Club in Austin from Temple, and that at the club Guess hollored "Hey,
cowboy" to him twice and motioned to him. He introduced himself. At closing time, he asked
Guess to go with him to the Dallas Nightclub. The two drove there in Northam's car. When the
Dallas Nightclub closed about 4 a.m., appellant said that Northam left with Phyliss Lewis who gave
appellant her telephone number. Northam told him not to call that number before noon. Appellant
left the club with Guess in Northam's black Mercury Cougar. Guess wanted to go to a motel, but
appellant did not have enough money for a motel. Guess explained that they could not go to her
home if her roommate was there. They drove to Guess's home. The roommate's car was not there
so Guess invited appellant into the house. 

 Appellant related that he took the ice chest with beer from Northam's car and took
it into the house. Appellant then drank two more beers. Guess placed a comforter on the living
room floor and invited him to lie down with her. Appellant did and they kissed and fondled each
other. They did not have sexual intercourse. Appellant stated that after he explained his
performance problems to Guess she became quiet for several minutes and then began talking about
visiting her parents in Amarillo. According to appellant, they then fell asleep. 

 Appellant testified that when he woke up he wandered into the bedroom while Guess
was still asleep in the living room. He sat on Guess's bed and noticed his fingernails were dirty. He
began cleaning them with his pocketknife. In cleaning off the blade of the knife, appellant said that
he cut his left index finger. He ran cold water over the cut in the bathroom. Guess awakened about
this time and brought appellant a small plastic bag of ice to put on his finger. Appellant then took
the ice chest to Northam's car. He then returned to the house and told Guess goodbye. Appellant
testified he left a little after 9 a.m. Guess was alive at the time.

 At the punishment stage of the trial, appellant offered the testimony of family and
friends that in the fifteen years between the time of the offense and the trial, appellant had no
criminal record and had led an exemplary life. He had married, had two children, worked
successfully in the construction business, and had been a leader in community activities such as his
church, Boy Scouts and family based organizations. Other defense evidence showed that appellant
was a person of utmost character and not a person of violence. Still other testimony showed
appellant had heart problems and his wife suffered from multiple sclerosis. Appellant acknowledges
that the instant offense was a "horribly brutal offense" but complains that in view of the foregoing
evidence the jury nevertheless assessed punishment at 99 years. Appellant urges that the penalty
assessed resulted from the errors raised on appeal. 


Pre-indictment Delay


 In his first point of error, appellant claims that after he showed that his Fifth
Amendment rights to due process were violated, the trial court erred in denying his amended motion
to dismiss the second indictment for pre-indictment delay. 

 The instant offense occurred on February 21, 1988. Appellant was indicted in 1988
for the murder of Debra Guess. The indictment was dismissed on May 1, 1989. Appellant was
reindicted for the same offense on April 14, 2000. The trial did not take place until September 2003. 
The time period of which appellant complains is from the time of the dismissal of the first indictment
until the presentation of the second indictment, a period of almost eleven years. 

 The applicable statute of limitations is the primary assurance against bringing unduly
stale criminal charges. Ibarra v. State, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999) (citing United
States v. Marion, 404 U.S. 307 (1971). There is, however, no Texas statute of limitations for the
offense of murder. See Tex. Code Crim. Proc. Ann. art. 12.01(A)(1) (West 2005). A defendant's
rights with respect to events occurring prior to indictment are not fully defined by a statute of
limitations. The due process clause of the Fifth Amendment to the United States Constitution has
a limited role to play in protecting against oppressive delay. United States v. Lovasco, 431 U.S. 783,
789 (1977); Marion, 404 U.S. at 325. 

 A defendant may be entitled to relief for pre-indictment delay under the due process
clause where he can show that the delay (1) caused substantial prejudice to his right to a fair trial,
and (2) was an intentional device used to gain a tactical advantage over the defendant. Ibarra, 11
S.W.3d at 193; Spence v. State, 795 S.W.2d 743, 746 (Tex. Crim. App. 1990). The Fifth Circuit
Court of Appeals has extended the second prong of the foregoing test to include "other
impermissible bad faith purposes" without defining the phrase. United States v. Crouch, 84 F.3d
1497, 1514 (5th Cir. 1996). 

 Applying the two-pronged test, we observe first that appellant claims that as a result
of the delay he lost "a fact witness at the time of death." This witness is not named. The time of the
witness's passing was not shown nor was there an accounting of the witness's purported testimony.
"A fact witness at time of death" is incongruous with the statement of facts including appellant's trial
testimony. Next, under the first prong of the test, appellant points out that early on a videotape was
jointly made by the district attorney and appellant's former counsel of three witnesses, all of whom
testified at trial. Appellant claims that the videotape was lost. The responsibility for the loss of the
tape was never established, and appellant does not claim that he was harmed by being deprived of
possible impeachment evidence. In order to prevail on the first prong of the test, appellant must
show "actual prejudice" as opposed to "potential prejudice." See Crouch, 84 F.3d at 1515. This
appellant has not done so. 

 As to the second prong of the test, Ashton Cumberbatch, a prosecutor in the case,
testified at the hearing on the motion to dismiss that the first indictment was dismissed prior to jury
selection on May 1, 1989, primarily to ensure the State an opportunity to further investigate the case. 
Cumberbatch testified that he was told that further scientific testing of the evidence by DNA analysis
would be helpful and that at the time DNA science was beginning to evolve. Cumberbatch left the
district attorney's office in July 1989. 

 Austin Police Detective Bruce Boardman had arrested appellant and investigated the
case. He testified that he believed that the case was ready for trial in May 1989 and was not pleased
with the dismissal order. He was told that additional witnesses would be called before a grand jury. 
He never heard that such action was undertaken. Later, Boardman was informed that more scientific
testing needed to be done. He knew that certain items had been sent to the Department of Public
Safety (DPS) Laboratory. Boardman revealed that he no longer investigated the case after May 1,
1989. He was not the case agent after 1992. 

 Irene Rios, supervisor of the DNA unit of the DPS laboratory, testified about the
advancement of DNA testing in the 1980 's and 1990's. She explained that in 1988 very few labs in
the United States did DNA testing using the RFLP technique and then only when a large amount of
matter was available for testing. The DPS lab did not begin using RFLP testing until 1994. Shortly
thereafter, the DQA technique became available but neither test was discriminating towards mixtures
of DNA material. Certain items in appellant's case had been sent to Dr. Ed Blake in California in
1990 for DQA testing. Rios explained that the STR technique became available at the DPS lab in
September 1998, a much improved technique for determining DNA mixtures. Rios reported that no
STR testing in the instant case was done from 1998 to 2000 because the case had been closed and
there had been no new requests for testing from the detectives. In September 1998, there was a large
number of cold cases backlogged at the lab for STR testing. Items in the instant case were submitted
in December 1999 and the results reported to the district attorney's office in March 2000. 

 Austin Police Detective Manuel Fuentes testified how appellant's case was re-opened. 
In March 1997, Fuentes was working on the unsolved murder of Cerrell Belt when he received
information that appellant might be involved in that case. He learned appellant had been earlier
indicted for the Guess murder. Fuentes found the Guess case in the closed file section in the storage
area of the Austin Police Department. Bodily fluids and appellant's DNA were found in the file. 
The items were submitted to the DPS to determine appellant's connection to the Belt case. The tests
cleared appellant as a suspect in the Belt case. Fuentes also decided to reopen the Guess case. In
March 2000, DNA testing further established appellant's involvement in the instant case. 

 In Lovasce, 431 U.S. at 795, the United States Supreme Court stated:


In our view, investigative delay is fundamentally unlike delay undertaken by the
Government solely "to gain tactical advantage over the accused," precisely because
investigative delay is not so one-sided. Rather than deviating from elementary
standards of "fair play and decency," a prosecutor abides by them if he refuses to
seek indictments until he is completely satisfied that he should prosecute and will be
able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors
who defer action for these reasons would subordinate the goal of "orderly expedition"
to that of "mere speed." This the Due Process Clause does not require. We therefore
hold that to prosecute a defendant following investigative delay does not deprive him
of due process, even if his defense might have been somewhat prejudiced by the
lapse of time. 



The foregoing is pertinent to the instant case. See Ibarra, 11 S.W.3d at 193-94. There is no
requirement that police conduct a continuous investigation in a case to prevent a Fifth Amendment
violation. Id. at 193. 

 Appellant has not adequately demonstrated that pre-indictment delay by the
prosecution violated the Due Process Clause of the Fifth Amendment. No actual prejudice has been
proven, and there is no showing that the prosecution was intentionally delayed to gain some tactical
advantage over appellant. We conclude that reliance on the possibility of prejudice inherent in any
extended delay is not enough. The trial court did not abuse its discretion in overruling the motion
to dismiss for pre-indictment delay. Point of error one is overruled. 


A Failed In Camera Inspection


 In point of error two, appellant states:


 The State committed reversible error when it failed to obey the trial judge's
order to furnish the offense report and the DNA lab reports in the unsolved Cerelle
Belt case so that the trial court could conduct an in camera hearing to determine if
there was any exculpatory or mitigating evidence contained therein. 



 At the outset, we make two observations. First, "[w]hether error has been adequately
preserved for appellate consideration cannot be evaluated, of course, unless the claimed error is first
formulated and identified. . . . Formulation of claims of error are best approached on the assumption
that only the trial judge can commit error. Further, error can, as a general matter, be committed only
when the trial judge refuses a request for action or takes action over objection." 43A George E. Dix
& Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 42.11 (2d ed. 2001). 
Moreover, a prosecutor cannot err. Id.; see also Chimney v. State, 6 S.W.3d 681, 703 (Tex.
App.--Waco 1999, pet. ref'd) (in improper jury argument situations, any error can only arise from
trial court's actions--overruling an objection, denying an instruction to disregard, or denying
mistrial). 

 Second, if the State can err as asserted by appellant, we do not find that the "error"
was preserved for review by an objection or otherwise. See Tex. R. App. P. 33.1. After the "order"
was granted, appellant did not object to the State's failure to act, request enforcement of the "order"
by the trial court, or obtain an adverse ruling. No motion for continuance was filed. Appellant
permitted the trial to conclude without requesting any further relief. Moreover, there is no showing
that if the State had produced the requested items for an in camera inspection by the trial court,
appellant would have been given access to items or be legally entitled to the same. 


In the Interest of Justice


 Nevertheless, appellant has cited Brady v. Maryland, 373 U.S. 83 (1963) (holding
State has affirmative duty to disclose favorable and material evidence to defense) and Thomas v.
State, 837 S.W.2d 106 (Tex. Crim App. 1992) (discussing in camera inspections), claiming that the
State's failure to produce the requested items for an in camera inspection violated his right to due
process and deprived him of a fair trial. In view of the nature of the offense, the penalty assessed,
and the claim of a due process violation, we shall in the interest of justice examine the record to
determine if appellant's contention has merit on another basis. We keep in mind that most of the
items requested were from the file in the 1990 murder of Cerrell (2) Belt which is still unsolved. 

 A brief recitation of background material is essential to placing the contention in
proper perspective. The instant offense occurred on February 21, 1988. Appellant was indicted for
the offense in 1988, but this indictment was dismissed in 1989. Detective Manuel Fuentes testified
that in 1997 he was working on the Belt case when he received a tip from a Texas Ranger that a
"Steven Macovich" might be involved. Belt's father had reported an anonymous telephone call
saying that the caller had overheard "Macovich" in a Temple bar say that he had murdered "a girl
from Lampasas." The report later proved to be false. It, however, led Fuentes to the instant case--a
closed file in the warehouse basement of the Austin Police Department. Bodily fluids and DNA
evidence in the file led to the reopening of the instant case. A comparison of DNA and fingerprint
evidence eliminated appellant as a suspect in the Belt murder case. Subsequently, appellant was
reindicted on this case in April 2000. 

 We will pretermit any lengthy discussions of the various motions for discovery and
disclosure of exculpatory evidence, the orders granting the motions, the withdrawal of the order, the
pretrial colloquies at the bench, the pretrial hearings, the taking of the issues under advisement, and
the lack of rulings on other occasions. 

 On September 19, 2003, after the jury was selected, appellant again asked for a
discovery ruling, but this time appellant narrowed his request to an in camera review of the "offense
report" and "the lab tests, DNA results" from the Belt case. In response to the trial court's inquiry,
the prosecutors stated that they had not reviewed the Belt case file for exculpatory evidence, but
another assistant district attorney and Detective Fuentes had. The trial court then stated:


Well, perhaps the Court should conduct an in camera review of whatever that is to
see whether it sees anything that would be exculpatory or mitigating and then put a
copy--a sealed copy in the record for this. So the Court will do that.



 This is the "order" upon which appellant relies. Immediately after the trial court's
statement, the prosecutor sought clarification in order to produce what the trial court wanted. The
discussion centered solely on the "offense report." The trial court stated that it wanted a copy to
review that would then be sealed and placed in the record. The prosecutor agreed to have a copy of
the "offense report" for the trial court by the following Monday. 

 The trial concluded without further record reference to the items sought. There was
no complaint addressed to the trial court about the State's failure to produce the "offense report" or
other items.

 In the motion for new trial, appellant alleged that the State failed to comply with the
trial court's order and "failed to allow the trial court to review the investigative file in the Belt case"
preventing appellant "from establishing a link between the unidentified hairs found on the victim in
the instant case and the perpetrator of the 'Cerelle' Belt murder." Appellant complained that the
State's failure violated the due process clauses of the federal and state constitutions. 

 A visiting judge heard and overruled the motion for new trial. It appears that
thereafter the visiting judge in an ex parte proceeding ordered that the Belt offense report be sealed
and made a part of this appellate record. 


Discovery, Brady and In Camera Inspections


 The instant case involves shades of the right to discovery, the Brady rule, and in
camera inspections. 

 A defendant in a criminal case does not have a general right to discovery of evidence
in the possession of the State. See Scaggs v. State, 18 S.W.3d 277, 294-95 (Tex. App.--Austin
2000, pet. ref'd); Gowan v. State, 927 S.W.2d 246, 249 (Tex. App.--Fort Worth 1996, pet. ref'd). 
Limited statutory discovery has been provided. See Tex. Code Crim. Proc. Ann. art. 39.14 (West
2005). The decision about what is discoverable under the statute has long been committed to the
discretion of the trial court. See Whitchurch v. State, 650 S.W.2d 422, 425 (Tex. Crim. App. 1983). 
And this was true at the time of appellant's trial. (3) Appellant does not rely upon article 39.14 to
support his contention. 

 In Brady, the Court stated:


We now hold that the suppression by the prosecution of evidence favorable to the
accused upon request violates due process where the evidence is material to guilt or
to punishment irrespective of the good faith or bad faith of the prosecutor.



373 U.S. at 87. 

 "As developed in two later decisions, United States v. Agurs [427 U.S. 97] in 1976
and United States v. Bagley [473 U.S. 667] in 1985, Brady creates what amounts to a federal
constitutional right to certain minimal discovery." 42 George E. Dix & Robert O. Dawson, Texas
Practice: Criminal Practice and Procedure § 22.21 (2d ed. 2001). (4) And the Texas Court of
Criminal Appeals has interpreted article I, section 19 of the Texas Constitution ('due course of law')
to give an accused the same rights he enjoys under Brady and its progeny. See Ex parte Adams, 768
S.W.2d 281, 293 (Tex. Crim. App. 1989). Nevertheless, the United States Supreme Court has stated: 
"There is no general constitutional right to discovery in a criminal case and Brady did not create
one." Weatherford v. Bursey, 429 U.S. 545, 559 (1979); see also Page v. State, 7 S.W.3d 207, 207
(Tex. App.--Fort Worth 1999, pet. ref'd); 42 Dix § 22.25. 

 To invoke Brady and its progeny, the accused must present evidence that (1) the
prosecution suppressed or withheld evidence; (2) the evidence would have been favorable to the
accused; and (3) this evidence would have been material to the accused's defense. Cruz v. State, 838
S.W.2d 682, 686 (Tex. App.--Houston [14th Dist.] 1992, pet. ref'd) (citing Moore v. Illinois, 408
U.S. 786, 794-95 (1972)). "Favorable" evidence is any evidence that, if disclosed and used
effectively, may make the difference between conviction and acquittal. Little v. State, 991 S.W.2d
864, 866 (Tex. Crim. App. 1999); Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992)
(citing United States v. Bagley, 473 U.S. 667, 676 (1985)). It includes both exculpatory and
impeachment evidence. Little, 991 S.W.2d at 866. Evidence that is exculpatory is evidence which
tends to justify, excuse, or clear the defendant from alleged fault or guilt. Thomas, 841 S.W.2d at
404. Impeachment evidence is that evidence which is offered to dispute, disparage, deny, or
contradict. Id. Evidence is "material" if there is a reasonable probability that had the evidence been
disclosed to the defense the result of the proceeding would have been different. See Bagley, 473
U.S. at 682. A "reasonable probability" is a probability sufficient to undermine the confidence in
the outcome of the trial. Id.; see also Kyles v. Whitley, 514 U.S. 434 (1995). 

 Under Brady, the defendant has the burden of showing that, in light of all the
evidence, it is reasonably probable that the outcome of the trial would have been different had the
prosecutor made a timely disclosure. Hampton v. State, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)
(citing Bagley, 473 U.S. at 682). 


In Camera Inspections


 As noted, the State has an affirmative and ongoing duty to disclose evidence favorable
to an accused and material to his guilt or punishment under the due process clause of the Fourteenth
Amendment. Brady, 373 U.S. at 87-88. This duty attaches with or without a request for the
evidence. Bagley, 473 U.S. at 682. The prosecutor, when unsure of whether to disclose the
evidence, should submit the evidence to the trial court for consideration. Agurs, 427 U.S. at 106;
Thomas v. State, 841 S.W. 399, 407 (Tex. Crim. App. 1992). This is, in effect, an in camera
inspection on behalf of the State. 

 In a typical case where the defendant makes no request or only a general request for
Brady material, it is the prosecutor who decides which information, if any, must be disclosed. The
prosecutor's decision on disclosure is final unless a defendant becomes aware that other exculpatory
evidence is being withheld and brings it to the attention of the trial court. Pennsylvania v. Ritchie,
480 U.S. 39, 59 (1987). (5)

 In some situations where a defendant has failed to receive anything less than full
disclosure under the Brady rule, he has a due process right to have the trial court examine the
requested evidence in camera and then order disclosure of any appropriate information. See Thomas, 
837 S.W.2d at 113, which relied heavily upon Ritchie, 480 U.S. at 58 n.15. It appears that a
defendant must make a preliminary showing of a "reasonable" or "plausible" probability that the
information at issue contains evidence to which he is entitled under the Brady rule. See Ritchie, 480
U.S. at 58 n.15; 42 Dix § 22.35; cf. Page, 7 S.W.3d at 215; Commonwealth v. Two Juveniles, 491
N.E.2d 234, 239 (1986) (requiring a showing of a legitimate need for the information). 

 Thomas detailed the procedure to be followed. 837 S.W.2d at 414. (6) It was this
procedure appellant sought to invoke when his Brady request seemed to fail. Appellant did not make
the required plausible showing but the trial court did indicate that it would conduct an in camera
inspection, seal the offense report and place it in the record. "Even if a defendant does not have a
right to in camera inspection under Thomas, a trial court has broad discretion to conduct an
inspection anyway and order the material produced for it." 42 Dix at 22.35. 

 We turn now to the items appellant contends should have been reviewed by the trial
court in camera. 


DNA Profiles


 In his point of error, appellant states that he was entitled under Brady to "DNA lab
reports" from the Belt case. Elsewhere in appellant's brief, reference is generally made to "DNA
profiles, reports, results or tests" without any further specification. It is clear from some trial
colloquy, allegations in the new trial motion, and appellant's suggested remand procedure that what
appellant wanted was the DNA profile from the semen found in the Belt case compared with the
DNA profiles from two unidentified hairs found in the instant case. The State argues that without
a comparison by an expert witness and the expert's testimony, the evidence had not yet come into
existence, and thus was not shown to be favorable or material under Brady, (7) and was not "evidence"
that had been suppressed. (8) Appellant was obviously seeking evidence to support his alternative
perpetrator defensive theory. As noted, appellant had been cleared as a suspect in the Belt case, a
case with some similarities to the instant case but also with more differences according to Detective
Fuentes. 

 Normally, courts will not order the State to produce information under Brady based
merely upon a defendant's speculation that the requested information contains exculpatory evidence. 
Page v. State, 7 S.W.3d 202, 206 (Tex. App.--Fort Worth 1999, pet. ref'd); Gowan v. State, 927
S.W.2d 246, 250 (Tex. App.--Fort Worth 1996, pet. ref'd) (refusing to make "leap of faith"
necessary to assume police file on seven unrelated rapes would show that rape for which defendant
was charged was committed by another assailant). "The mere possibility that an item of undisclosed
information might have helped the defense or might have affected the outcome of the trial does not
establish 'materiality' in the constitutional sense." Agurs, 427 U.S. at 109; see also Hampton v.
State, 86 S.W.3d at 612. 

 Usually a determination concerning the materiality prong of Brady involves balancing
the strength of the exculpatory evidence against the evidence supporting the conviction. Hampton, 
63 S.W.3d at 613 (citing Bagley, 473 U.S. at 683). The information appellant wanted disclosed had
not yet come into existence and thus it was not shown to be material for Brady purposes. The
evidence supporting appellant's conviction was overwhelming. The scale tilted. There was nothing
to balance under the circumstances. (9)

 Moreover, clarification by the trial court appeared to limit his intended in camera
inspection to the "offense report" in the unrelated Belt case. Appellant has not demonstrated error
in the State's failure to facilitate an in camera review of the DNA profiles in question.


Offense Report


 Next, we turn to the "offense report" in the Belt case of which appellant wanted the
trial court to make an in camera review. The "offense report" was sealed and placed in the record
by a visiting judge in an ex parte hearing after the motion for new trial was overruled. We have
examined the "offense report" and find it to be a collection dated October 13, 1997, of a series of
"incident reports" from 1990, 1992, 1994, and 1997. No later reports were included. The "offense
report" reflects investigation into the unsolved Belt case, collection of evidence at the scene and
elsewhere, interviews with witnesses and suspects, and other normal investigative procedures. We 
find no mention of the instant case or of appellant even though he was investigated and cleared as
a suspect in the Belt case. Thus, the indication is that not all the "incident reports" were included
in the "offense report" now in the record. Nothing included in the Belt "offense report" in this
record constitutes exculpatory or material evidence in the instant case so as to invoke Brady. The
mere possibility that appellant may have found the name or names of other men or suspects to
suggest as alternative perpetrators in the instant case which might have helped the defense or might
have affected the outcome of the trial is not "materiality" under Brady. See Hampton, 63 S.W.3d
at 612; see also United States v. Kotex, 174 F.3d 580, 583 (5th Cir. 1999). Appellant cannot rely
upon speculation in this regard. See Gowan, 927 S.W.2d at 250. 

 Police arrest and offense reports are not generally subject to production. Brem v.
State, 571 S.W.2d 314, 322 (Tex. Crim. App. 1975); Holloway v. State, 525 S.W.2d 165, 168 (Tex.
Crim. App. 1975). The prosecution is not required to disclose its investigative work. See Rector v.
Johnson, 120 F.3d 551, 558 (5th Cir. 1997). Although the State must disclose evidence under the
Brady rule, it "need not disgorge every piece of evidence in its possession. Id. The State is under
no duty to disclose neutral or inculpatory information to the defendant, United States v. Johnson, 872
F.2d 612, 619 (5th Cir. 1989), or share all useful information with the defendant. United States v.
Ruiz, 536 U.S. 622, 629 (2002). The prosecution cannot be required to anticipate all possible
defenses and provide the defendant with information to bolster those defenses. See United State v.
Runyan, 290 F.3d 223, 245-46 (5th Cir. 2002). 

 The State has a compelling interest in law enforcement and in solving crimes. As the
pretrial testimony demonstrated the prosecutors feared that the production of the Belt investigative
file, including the "offense report," would reveal facts known only to the killer of Belt, preventing
any future prosecution in that case. The State's interest would clearly outweigh the claimed interest
of appellant in the Belt case under the circumstances here presented. We find no due process
violation. Point of error two is overruled. 


Excluding Alternative Perpetrator Evidence


 In his third and fourth points of error, appellant contends that the trial court erred in
prohibiting the defense from presenting evidence to show that the perpetrator of the offense might
have been Michael Smith or Gary Gaston. Appellant argues that each time he attempted to offer
evidence to show that Smith or Gaston could have been alternate perpetrators, the trial court
excluded the evidence on the basis of Wiley v. State, 74 S.W.3d 399 (Tex. Crim. App. 2002). 
Appellant asserts that the trial court's evidentiary rulings denied him the opportunity to present a
meaningful defense. We review the trial court's rulings for an abuse of discretion. Montgomery v.
State, 810 S.W.2d 372, 390-91 (Tex. Crim. App. 1991) (op. on reh'g); Patterson v. State, 96 S.W.3d
427, 434 (Tex. App.--Austin 2002, no pet.). 

 Through the Sixth and Fourteenth Amendments to the United States Constitution,
persons accused of crimes are guaranteed a meaningful opportunity to present a complete defense. 
Crane v. Kentucky, 476 U.S. 683, 690 (1986); California v. Trombetta, 467 U.S. 479, 485 (1984).


Although a defendant obviously has a right to attempt to establish his innocence by
showing that someone else committed the crime, he still must show that his proffered
evidence regarding the alleged alternate perpetrator is sufficient on its own or in
coordination with other evidence in the record to show a nexus between the crime
charged and the alleged "alternate perpetrator."



Wiley, 74 S.W.3d at 406; see also Patterson, 96 S.W.3d at 434; Matthews v. Price, 83 F.3d 328, 332
(10th Cir. 1996) (noting, in federal habeas proceeding, that the State court had held that "a defendant
may not present evidence that another was an alternate suspect of a crime without proof that the other
person committed some act directly connecting him with the charged crime."); State v. Woods, 508
S.W.2d 297, 300 (Mo. App. 1974) ("evidence that another person had opportunity or motive for
committing the crime for which the defendant is on trial is not admissible absent proof that the other
person committed some act directly connecting him with the crime.").


It is not sufficient for a defendant merely to offer up unsupported speculation that
another person may have done the crime. Such speculative blaming intensifies the
grave risk of jury confusion, and it invites the jury to render its findings based on
emotion or prejudice. 



United State v. McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998); see also Wiley, 74 S.W.3d at 407
n.21.


Facts Concerning Michael Smith


 As observed earlier, Smith was a crucial witness for the State. At the time of the
offense in February 1988, the eighteen-year-old Smith lived with his father and stepmother, across
the street from where the victim lived. He had been there only a few weeks. On the morning in
question, Smith was washing windows while his father observed. Smith testified that he saw
appellant exit the victim's house about 10 a.m. and place two trash bags in the black Mercury Cougar
automobile parked in the victim's driveway, return to the house, and then shortly thereafter return
to the car and drive off. 

 Some fifteen years later, and several weeks prior to appellant's trial in September
2003, appellant's trial counsel learned that Smith's parental rights to a child had been terminated on
August 31, 2003, following a jury trial. The trial court quashed a subpoena issued for Ann Foreman,
assistant district attorney, who had represented the Child Protective Services in the termination case. 
The trial court did conduct an in camera review of the district attorney's file in the termination case
but refused to look for any exculpatory or mitigating evidence. The trial court ordered that the State
keep the file and at a later date the court would rule on the defense request to seal the file and make
it a part of the appellate record. 

 On October 1, 2003, during trial, appellant filed a "motion to introduce evidence
concerning Michael Smith's propensity for violence and other specific acts," along with a brief and
a copy of the "transcript" from the termination proceedings. Appellant proffered to the trial court
that the evidence showed that (1) Smith had committed perjury at the termination trial, (2) Smith was
on felony probation for driving while intoxicated at the time of the instant trial (this fact was elicited
before the instant jury when Smith testified), and (3) one of the allegations in the termination
proceeding was that Smith had sexually abused his own child. The trial court ruled that appellant
could not introduce this evidence to show that Smith might have been an alternate perpetrator of the
murder. 

 Appellant perfected an informal bill of exception eliciting testimony from Neely
Peterson, Smith's ex-wife, that Smith was not a trustworthy person. She related that she was dating 
Smith in February 1988 and that they married in August 1988; that he later became violent with her,
slapping her, giving her a black eye, and pushing her to the ground. On one occasion, she went to
the hospital for sutures as a result of his violence. After the bill was perfected, the trial court
permitted her to testify before the jury only that Smith was not a truthful person. 

 On October 7, 2003, appellant perfected another bill of exception by calling Ann
Foreman to testify about what occurred at the termination proceedings. She related that the evidence
showed Smith had committed domestic violence against his first wife, Neely, and that the jury
terminated his parental rights to his daughter. Foreman testified that she had no opinion about
Smith's "character for truth," but acknowledged that during the termination proceedings, she told
the trial judge Smith was not being truthful on "any issue whatsoever." The trial court did not permit
Foreman to testify before the jury in this murder trial.

 The evidence appellant sought to offer concerning Smith was inadmissible. The
evidence relating to Smith's misconduct particularly with family members in the fifteen year post-murder period was speculative at best to show that Smith was an alternate perpetrator of the murder. 
The testimony also would have presented a great threat of "confusion of issues." Wiley, 74 S.W.3d
at 407. If admitted, the testimony would have forced the State to attempt to disprove that Smith's
post-murder conduct rendered him the perpetrator of the crime charged, when there was no act
directly connecting him with the offense charged. Appellant argues that Smith lived across the street
from the murder scene and had an opportunity to have committed the offense. But without proof of
an act directly connecting Smith with the offense charged, mere opportunity is insufficient. Woods,
508 S.W.2d at 300. 

 In light of the medical examiner's testimony that the victim died between 9 and 9:30
a.m. on the morning of February 21, 1988, and appellant's testimony that he and the victim were
alone together at the victim's house until approximately 9 a.m. that morning, Smith's observations
confirming appellant's departure about 10 a.m. while Smith was washing windows under the
watchful eyes of his father and stepmother demonstrate no nexus between the crime charged and the
alleged "alternate perpetrator." See Wiley, 74 S.W.3d at 406. Under the circumstances, the trial
court did not abuse its discretion in excluding the evidence offered. Appellant was not deprived of
his constitutional right to present a defense. Appellant has not briefed the admissibility of the
evidence under Rules 401, 402, or 403 of the Texas Rules of Evidence. See Tex. Rules App. P. 39.1. 
The third point of error is overruled. 


Facts Concerning Gary Gaston


 Guess's roommate, Stephanie Walrath, who discovered the body upon her return to
the house on the morning of February 21, 1988, testified that Gary Gaston had been dating Guess
and that Guess and Gaston had spent the night together on Friday, February 19, 1988 at Gaston's
apartment. Walrath testified that the next night (Saturday), she drove Guess to the New West Club
because Guess wanted to show her new outfit to Gaston. Guess returned to Walrath's car and told
Walrath that Gaston was not at the club, but that she was going to stay at the club. Walrath never
saw Guess alive again. 

 Michael Smith saw a man leaving Guess's house about 10 a.m. on February 21, 1988
wearing western clothes, jeans, a red shirt, and wearing a white or tan straw cowboy hat. The man
drove away in the black Mercury Cougar parked nearby. The police picked up Gaston at 11 a.m.
approximately thirty minutes after the discovery of Guess's body. He was shirtless, wearing jeans,
and carrying a white straw cowboy hat. The place of arrest was described as "fifteen minutes away"
from the murder scene. 

 There was evidence that when appellant was seen with Guess, appellant was wearing
a black felt hat. Appellant admitted that he was the man who drove the black Cougar away from
Guess's house. Smith later changed his testimony and said the man leaving the house could have
been carrying a "regular" cowboy hat. 

 The DNA test results were admitted into evidence. Known hair samples of Gaston
were compared with hair samples found at the murder scene. Gaston was excluded as a contributor. 
Gaston's DNA was compared to blood stains found and he was excluded as a contributor to any of
that evidence. 

 Gaston testified for the State. He described Guess as a good friend and acknowledged
that they had a sexual relationship. Gaston stated that he and Guess had spent the Friday night prior
to the offense together at his apartment and that they had sexual relations. He stated that he spent
the next night at his ex-wife's apartment. He did not leave there until about 10 a.m. on the morning
of the offense. Nidia Hirom, Gaston's ex-wife, confirmed that he did not leave her apartment until
10 or 10:30 a.m. on February 21, 1988. 

 On cross-examination of Gaston, appellant sought permission to inquire about
Gaston's violent nature with his ex-wife. The trial court denied the request citing Wiley. Appellant
argued that he had a right to present a defense of an alternate perpetrator. Counsel argued that
Gaston had a violent past, he was arrested thirty minutes after the body was discovered and only
fifteen minutes away from the murder scene, and he had a white straw cowboy hat like that
reportedly seen by Smith. The trial court persisted in its ruling. Later, appellant's trial counsel made
an offer of proof to the effect that if Gaston's ex-wife was allowed to testify, she would tell the jury
that Gaston committed family violence on her " up and through 1987" and on occasions choked her
as the victim had been choked. The trial court did not permit this evidence before the jury. 

 Still later, appellant's counsel made another offer of proof that if the ex-wife was
allowed to testify, she would state that in 1987 she had a confrontation with Gaston about stealing
money from his son's piggy bank to buy drugs. On that occasion, Gaston grabbed her by the throat,
choked her, and shoved her against a wall. Here again, the trial court did not permit this evidence
before the jury. Appellant contends that he was deprived of his constitutional right to present a
defense of an alternate perpetrator. Under the circumstances, the trial court did not abuse its
discretion in excluding the evidence. The proffered evidence regarding the alleged alternate
perpetrator was not sufficient on its own or in combination with other evidence to show a nexus
between the crime charged and the alleged "alternate perpetrator." Wiley, 74 S.W.3d at 406. 
Appellant was not deprived of his claimed constitutional right. Here again, appellant does not brief
this point of error as relating to Rules 401, 402, and 403 of the Texas Rules of Evidence. See Tex.
R. App. P. 38.1. The fourth point of error is overruled. 


Motion for Mistrial - Evidence of Drug Use


 In the fifth point of error, appellant asserts that the trial court erred in failing to grant
a mistrial at the punishment stage of the trial when the prosecutor elicited testimony from David
Presley that appellant used drugs in 1977 and 1978. The State had been instructed by the trial court
not to elicit such testimony. 

 In absence of the jury, David Presley testified that he and appellant were good friends. 
In 1987, they had "partied" together in several counties, using cocaine and ecstasy. There was also
one incident with a prostitute. As a result of a violation of a discovery order and other legal reasons,
the trial court ruled that Presley would not be permitted to give the same testimony before the jury. 
The prosecutor then stated that Presley would be called only as a character witness, and Presley
would be instructed as to what testimony would be impermissible. 

 Before the jury, the record reflects Presley's direct examination:


Q. Back in the time period specifically 1987 prior to the offense date of February
21st of 1988, did you have an opinion as to the defendant's character for being
a law-abiding citizen?


A. Yes.


Q. And what was that opinion? Was he a law-abiding citizen?


A. Not in respect to the drug use that we had. 



The trial court immediately sustained appellant's objection and instructed the jury to disregard the
answer, but denied appellant's motion for a mistrial. 

 The denial of a motion for mistrial is reviewed under an abuse of discretion standard. 
Trevino v. State, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); Bryant v. State, 25 S.W.3d 924, 926
(Tex. App.--Austin 2000, pet. ref'd). Ordinarily, a prompt instruction by the trial court to disregard
will cure error associated with an improper question, answer, or argument. Avalle v. State, 13
S.W.3d 774, 783 (Tex. Crim. App. 2000). The jury is presumed to follow the trial court's instruction
to disregard unless the comment is so prejudicial or extreme that the instruction was incapable of
removing the harm; Gardner v. State, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); Campos v.
State, 589 S.W.2d 424, 428 (Tex. Crim. App. 1979). Mistrials should be granted only when the error
is "highly prejudicial and incurable." Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App.
2003). 

 The error here occurred after appellant had been found guilty. The error was one
relating to punishment only. After the instruction to disregard, Presley did not repeat his testimony
nor was there any other mention of drug use in the testimony or in the jury argument that followed. 
Appellant faults the State for its action earlier at the guilt-innocence stage of the trial in attempting
to insinuate drug use. Two unobjected-to jury arguments at the first stage of the trial are called to
our attention. We have carefully considered appellant's argument but conclude that the trial court
did not abuse its discretion in denying the motion for a mistrial. Point of error five is overruled. 


Another Motion for a Mistrial - 

Victim's Mother in Mental Hospital


 In the sixth point of error, appellant asserts that the trial court erred in denying the
motion for a mistrial at the punishment stage of the trial when the victim's father testified that he had
just put the victim's mother in a mental hospital. Appellant claims this testimony was elicited in
violation of an agreement he had with the State. 

 In the absence of the jury, the trial court discussed with counsel the witnesses who
would be called at the punishment stage of the trial. The State informed the court that the victim's
father was flying to Austin to testify, that he and the victim's mother had returned to Amarillo, and
she had been placed in a mental hospital. Later, appellant's counsel told the court that he had heard
rumors that the State would offer evidence that "this trial" was the reason the mother was in a mental
institution. He asked that the court first hear this evidence in the absence of the jury. 

 One of prosecutors replied that the State would just have the victim's father explain
that his wife was ill; that the trial had been traumatic for the victim's mother, but the State was not
going "to blame the entire trial" for her mental illness; and that the State understood that the mother
had had prior mental issues. The trial court then began to discuss other matters. This is the only
evidence of an "agreement" in the record. 

 At the punishment hearing, Robert Guess testified that he and his wife lived in
Amarillo and had traveled to Austin for the trial. The record then reflects on direct examination:


Q. And did you stay, you and Mrs. Guess - did you stay until late last week and
then have to go back to Amarillo?


A. Yes, ma'am. We had to . . .


Q. And were the details of this trial too much for your wife?


A. Yes, ma'am, I think it got to her. Too much of a past from when you start from
a little . . . a little girl and all of a sudden and then she'd grow up and everything
and it's kind of got to her. In fact, I had to put her into a mental hospital.



 Appellant's counsel objected stating that he thought there was an agreement on "this." 
The prosecutors acknowledged there was an agreement. The trial court sustained the objection and 
instructed the jury to disregard the witness's last statement, but denied the motion for mistrial. 

 After both sides closed at the punishment stage of the trial, appellant's counsel made
what he labeled a "bystanders bill" that there had been an agreement with the State about Robert
Guess's testimony about his wife. The bill or offer was essentially what was reflected by the earlier
discussion. The trial court took no action on the matter thereafter. No jury argument touched on the
issue. 

 As observed earlier, a prompt instruction to disregard will ordinarily cure any error
associated with an improper question, answer, or argument. Ovalle, 13 S.W.3d at 783. Robert
Guess's comment was not so prejudicial or extreme that the trial court's instruction was incapable
of removing the harm. Gardner, 730 S.W.2d at 696; see also Simpson, 119 S.W.3d at 272. 

 Appellant urges that the State was responsible for the improper answer or comment. 
He relies upon Stahl v. State, 749 S.W.2d 826 (Tex. Crim. App. 1988). There, a murder conviction
was reversed because of the prosecutor's actions. Knowing the emotional state of the witness, the
prosecutor called the victim's mother to the witness stand to identify a photograph of her son in the
morgue. Although cautioned by the trial court, the mother began to sob on the stand and yell at the
defendant. Subsequently, the prosecutor took advantage of this emotional outburst before the jury
in his jury argument. The court, in effect, concluded that the prosecutor had orchestrated the
outburst. Stahl is to be distinguished on its facts and the law. 

 Appellant also cites Ulmer v. State, 292 S.W. 245, 246 (Tex. Crim. App. 1927). 
There in a rape case, a daughter of the defendant and a sister to the complaining witness testified for
the State. The record reflected:


Q. How long had you been living with your father at that time?


A. All my life except when he was in the penitentiary. 



 The trial court sustained the objection and instructed the jury to disregard the
statement about the penitentiary. The opinion does not mention a motion for a mistrial. This issue
was presented by a formal bill of exception, which was the method of presenting issues on appeal
at the time. The appellate court combined this bill with another bill of exception before deciding to
reverse the conviction. The other bill reflected that the same witness was shown to be the mother
of a small child. When asked if she was married at the time, she replied, "No, sir; it was my father's
baby." 

 The nature of the answers in Ulmer is far different from the nature of Robert Guess's
statement in the instant case. Moreover, in Ulmer there was a unitary trial, not a bifurcated one. The
issue of guilt had not been decided when the witness's answers were given in Ulmer. 

 We cannot say that the trial court abused its discretion in denying the motion for
mistrial in the instant case after the jury instruction was given. Point of error six is overruled. 


The Failure to Instruct on Defendant's Failure to Testify


 In the seventh point of error, appellant contends that the trial court erred in failing to
instruct the jury in its charge at the punishment stage of the trial that no adverse inferences could be
drawn from his failure to testify. 

 Appellant testified at the guilt-innocence stage of the trial waiving his privilege
against self- incrimination at that stage. He did not testify at the second stage of the trial. The trial
court did not instruct the jury at this stage of the trial on appellant's right to remain silent without
any adverse inferences being drawn therefrom. There was no request from appellant for such an
instruction nor was any objection to the charge made because of the omission of the instruction. 
Appellant did not seek in any way the employment of the cautionary or prophylactic instruction. 
Now on appeal appellant claims that the trial court erred in not sua sponte giving the instruction at
the punishment stage of the trial. Appellant contends that the error can be reviewed under the
constitutional harmless error analysis of Chapman v. California, 386 U.S. 18 (1967) and Rule
44.2(a) of the Texas Rules of Appellate Procedure or as "fundamental" error resulting in "egregious
harm" under Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984 (op. on reh'g)) We do
not agree. An appellate court's first duty in evaluating a jury charge issue is to determine whether
error exists. Middleton v. State, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); Hutch v. State, 922
S.W.2d 166, 171 (Tex. Crim. App. 1996). Before a harm analysis there must be error. 

 There are federal and state constitutional guarantees that an accused in a criminal case
may not be compelled to give self-incriminating testimony. See U.S. Const. Amend. V, cl. 3; Tex.
Const. art. I, § 10; see also Tex. Code Crim. Proc. Ann. arts. 1.05, 38.08 (West 2005). The Fifth
Amendment command is applicable to the states through the Fourteenth Amendment to the United
States Constitution. Carter v. Kentucky, 450 U.S. 288, 297; see also Malloy v. Hogan, 378 U.S. 1
(1964). 

 In Carter, the United States Supreme Court held that a defendant in a state criminal
trial has the right under the privilege against self-incrimination protected by the Fifth and Fourteenth
Amendments upon request, to have the trial court give the requested "no adverse inferences"
instruction. The trial court has the constitutional obligation upon proper request to give the
instruction to minimize the danger that the jury will give evidentiary weight to a defendant's failure
to testify. 450 U.S. at 305. The Carter opinion made clear that its holding depended upon a proper
request by a defendant for the instruction. See id. at 300, 303, 305. Justices Stevens and Brennan
concurred, expressly pointing out that the court's holding was actually limited to cases in which the
defendant had requested a "no adverse inferences" instruction, and the question whether such an
instruction should be given in any specific case should be answered by the defendant and his lawyer,
not by the State. 450 U.S. at 307. 

 Other courts have followed Carter, holding that the trial court is only required to give
a "no adverse inferences" instruction when proper request is made, and that failure to give an
unrequested instruction is not error. See, e.g., United States v. Gomez-Olivas, 887 F.2d 500, 501-02
(10th Cir. 1990); Coleman v. Brown, 802 F.2d 1227, 1234-35 (10th Cir. 1986); Dutton v. State, 674
F.2d 1134, 1139-40 (Okla. Crim. App. 1984). The Carter rule also applies to the punishment phase
of a bifurcated trial. See United States v. Flores, 63 F.3d 1342, 1376 (5th Cir. 1995). 

 Texas cases are generally in accord with Carter. If a defendant properly requests or
timely objects, he is entitled to a jury instruction that his failure to testify cannot be taken as a
circumstance against him. See, e.g., Wilkens v. State, 847 S.W.2d 547, 553 (Tex. Crim. App. 1992);
Brown v. State, 617 S.W.2d 234, 238 (Tex. Crim. App. 1981). 

 The rule also applies to Texas bifurcated jury trials under article 37.07(2)(a). Tex.
Code Crim. Proc. Ann. art. 37.07(2)(a) (West Supp. 2005); (10) Wilkens, 847 S.W.2d at 553; Beathard
v. State, 767 S.W.2d 423, 432 (Tex. Crim. App. 1989); Mose v. State, 632 S.W.2d 344, 345 (Tex.
Crim. App. 1982). 

 Brumfield v. State, 445 S.W.2d 732, 741 (Tex. Crim. App. 1969), earlier concluded
that if article 37.07 could be interpreted as providing for two separate proceedings, it followed that
a defendant's waiver of his privilege against self-incrimination by testifying at the guilt stage of the
trial is limited to that particular stage. Thus, appellant retains his Fifth Amendment privilege at the
punishment stage of the trial. (11) 

 In Stewart v. State, 666 S.W.2d 548 (Tex. App.--Dallas 1984, pet. ref'd), the court
reversed the conviction because the trial court refused to give the requested instruction upon request. 
There the Stewart court wrote:


Although appellant's testimony at the guilt-innocence stage may be considered by the
jury in assessing punishment, Brumfield, 445 S.W.2d at 740, the protection against
self-incrimination continues until all proceedings have terminated. Since appellant
testified during guilt-innocence, the jury never received an instruction regarding
appellant's right to remain silent; hence, they may have been more disposed than the
Brown jurors to give evidentiary weight to appellant's unexplained silence during the
punishment phase. 



Id. at 549.

 Brown, 617 S.W.2d at 238, made clear in tracking Carter that a defendant is entitled
to a "no adverse inferences" instruction only if he timely requests one. See also Jannine v. State, 789
S.W.2d 623, 628 (Tex. App.--Beaumont 1990, pet. ref'd). A trial court is under no obligation to
give such instruction in the absence of a timely request or objection. Anderson v. State, 504 S.W.2d
507, 511 (Tex. Crim. App. 1974); see also Gentech v. State, 654 S.W.2d 768, 771 (Tex.
App.--Houston [14th Dist.] 1983, no pet.).

 Some courts have spoken in terms of waiver of the right to the cautionary instruction
in the absence of a request or objection. See Calderon v. State, 950 S.W.2d 121, 132 (Tex. App.--El
Paso 1997, no pet.); Ulloa v. State, 901 S.W.2d 507, 510 (Tex. App.--El Paso 1995, no pet.);
Castenada v. State, 852 S.W.2d 291, 294-95 (Tex. App.--San Antonio 1993, no pet.). A waiver of
a "right" is distinguished from a waiver of an "error." Until there is a timely request for the
instruction the constitutional right to the instruction does not arise. Only if there is a timely request
for the instruction and the trial court refuses the request does error occur. 

 Whether to request a "no adverse inferences" jury instruction is within the tactical
discretion of the defense counsel. Gomez-Olivas, 887 F.2d at 502; Henson v. State, 734 S.W.2d 119,
120 (Tex. App.--Houston [1st Dist.] 1987, pet. ref'd). Cf. Posey v. State, 966 S.W.2d 57, 62-63
(Tex. Crim. App. 1998) (holding defensive issues not "applicable to the case" within article 36.14
of code of criminal procedure unless and until defense counsel raises issue by requesting jury
instruction on issue); see also 43A George E. Dix & Robert O. Dawson, Texas Practice: Criminal
Practice and Procedure § 42.224 (2d ed. 2001). 

 Defense counsel may not want the "no adverse inferences" instruction given for a
variety of reasons. (12) The trial court is entitled to know that the defendant is foregoing the giving of
the instruction in question. (13) In the absence of a proper request or timely objection, the trial court
is under no obligation to give the instruction and does not err in excluding the instruction in the jury
charge. 

 In the instant case, appellant made no request for or objection to the failure of the trial
court to sua sponte give a no adverse inferences jury instruction at the punishment stage of the trial. 
There was no error, and without an error, there is no need for a harm analysis. The seventh point of
error is overruled. 

 The judgment is affirmed.



 

 John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Puryear and Onion*

Affirmed

Filed: February 2, 2006

Publish











* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1.   The current code is cited for convenience.
2.   The parties have also used the spelling "Cerelle" Belt. Detective Manuel Fuentes, who
investigated the Belt case, spelled the name for the record as "Cerrell." 
3.   Article 39.14 was amended in 2005 to eliminate much of the trial court's discretion,
"[s]hall order" has replaced "may order." See Act of May 29, 2005, 79th Leg., R.S., ch. 1019, § 1,
2005 Tex. Gen. Laws effective June 18, 2005. The amendment is not applicable to appellant's case. 
4.   Under United States v. Agurs, 427 U.S. 97 (1976), a request for Brady material is not
required. 
5.   In Pennsylvania v. Ritchie, 480 U.S. 39 (1987), the Supreme Court held that an accused
sexual abuser of a child had a right under the due process clause of the Fourteenth Amendment to
have privileged records of a child abuse agency turned over to the trial court for in-chambers review
of material information. The court held that a judicial in camera inspection of privileged records
strikes a constitutional balance between the defendant's and the State's competing interests. Id. at
58-61. 
6.   [The] information should be inspected by the trial court in camera. Neither the

attorneys for the State nor defendant should be present. It will be the
responsibility of the court to determine if the produced information contains
Brady evidence. The court must, in its sound discretion, take steps to ensure that,
to the extent possible, the information remains confidential. If the information
is deemed material at the time it is inspected or at any future stage of the trial, it
must be released to the defendant. . . . At the conclusion of trial, the information
shall be sealed and made part of the record. 


Thomas v. State, 841 S.W.2d 407, 414 (Tex. Crim. App. 1992).
7.   Nothing in this record shows that appellant was precluded from requesting that the DNA
samples be submitted for analysis by his own expert. See Scaggs v. State, 18 S.W.3d 277, 296 (Tex.
App.--Austin 2000, pet. ref'd). 
8.   The State apparently had not determined that a comparison of DNA profiles was necessary
to a proper investigation in either the Belt case or instant case. 
9.   An in camera review of the DNA profiles from each case as requested, without an analysis
by an expert witness, would serve little purpose. Even if the trial judge was an expert in the DNA
field, a judge cannot be a witness. See Tex. R. Evid. 605. 
10.   Our bifurcated trial procedure is limited to cases involving pleas of not guilty before a jury. 
See Tex. Code Crim. Proc. Ann. art. 37.07(2)(a) (West Supp. 2004-05); Barfield v. State, 63 S.W.2d
446, 449 (Tex. Crim. App. 2001); Dunhart v. State, 668 S.W.2d 384, 386 n.3 (Tex. Crim. App.
1984); Baraldua v. State, 481 S.W.2d 851, 852-53 (Tex. Crim. App. 1972). This limitation is not
always carefully observed. 
11.   Brumfield v. State, 445 S.W.2d 732 (Tex. Crim. App. 1969) was a plurality opinion. The
holding was later embraced by the majority. See Beathard v. State, 767 S.W.2d 423 (Tex. Crim.
App. 1989); Nelson v. State, 765 S.W.2d 401 (Tex. Crim. App. 1989); Brown v. State, 617 S.W.2d
234 (Tex. Crim. App. 1981).
12.   Defense counsel frequently complain when the no adverse inferences instruction is given
in the jury charge. See Jefferson v. State, 501 S.W.2d 322, 326 (Tex. Crim. App. 1973); Handley
v. State, 480 S.W.2d 738, 741 (Tex. Crim. App. 1971); Smith v. State, 455 S.W.2d 748, 754 (Tex.
Crim. App. 1970). When requested by the defense not to give the instruction, the better practice for
the trial court is to omit the instruction. Lujan v. State, 626 S.W.2d 854, 863 (Tex. App.--San
Antonio 1981, pet. ref'd). 


 Defendants who testify at the guilt stage of a jury trial and deny guilt often find themselves
in an awkward position after conviction. If they testify at the punishment phase and express remorse
for the crime committed, the jury may well infer they were lying at the earlier stage of the trial. If
the defendants continue to assert their innocence in their subsequent testimony, the jury may not
favorably view such action. 
13.   A trial court should not be "sandbagged" by the failure of the defendant counsel to request
a no adverse inferences instruction and a later claim on appeal that the defendant's constitutional
rights were violated by the trial court's failure to give the jury instruction.